**David L. MOLPUS et al., Plaintiffs,**

**v.**

**Porter L. FORTUNE, Jr., et al.,
Defendants.**

**No. WC 7010–S.**

United States District Court,
N. D. Mississippi, W. D.

March 31, 1970.

Douglas C. Wynn and J. W. Watkins, III, Eugene M. Bogen, James L. Robertson, of Campbell, DeLong, Keady & Robertson, Greenville, Miss., for plaintiffs.

William A. Allain, Asst.Atty.Gen., of Miss. Ed. D. Noble, Jr., Sp. Asst.Atty. Gen., of Miss., James E. Rankin, Jackson, Miss., Will A. Hickman, Oxford, Miss., for defendants.

## OPINION

ORMA R. SMITH, District Judge.

This action has been submitted to the Court on plaintiffs' motion for a temporary restraining order, or temporary or permanent injunction requiring the University of Mississippi to approve plaintiffs' request for permission to invite Tyrone Gettis, President of the Student Body of Mississippi Valley State College, Itta Bena, Mississippi, to speak on the University campus.

The Court afforded the parties a full and complete hearing on the issues involved in the case at the United States Courthouse, in Oxford, Mississippi, on Saturday, March 14, 1970. After the submission of briefs, counsel for the parties were heard in oral argument, at Oxford on Wednesday, March 25, 1970. The hearing was held upon notice to defendants and all interested parties. The parties were represented by counsel at the hearing. Under these circumstances the Court will consider the matter as an application for a preliminary injunction. Rule 65(a) Federal Rules of Civil Procedure.

In a consolidated action pending in this Court, Stacy v. Williams, No. WC 6725–K and Cupit v. Roberts, No. WC 6837–K, a three-judge District Court composed of Honorable William C. Keady, Chief Judge, United States District Court for the Northern District of Mississippi, Honorable James P. Coleman, Circuit Judge for the United

States Court of Appeals for the Fifth Circuit, and Honorable Dan M. Russell, Jr., United States District Judge for the Southern District of Mississippi, promulgated rules concerning guest speakers at the various institutions of higher learning in the State of Mississippi. The University of Mississippi is one of the institutions covered by the rules.

The Court provided that the rules should remain effective until repealed by order of the Board of Trustees of the Institutions of Higher Learning of the State of Mississippi. The rules have not been repealed by the board and are now in force and control the acts of the parties in this case. The rules are set forth in an appendix attached to this opinion.[1]

Plaintiffs *Molpus, Cupit* and *Webb* are members of the University of Mississippi Chapter of the Young Democratic Clubs of Mississippi.[2] Plaintiff Webb is President of *UMYD*.

Pursuant to the rules above mentioned, on March 4, 1970, *UMYD* presented to defendant Fortune, as Chancellor and acting head of the University, a request for permission to invite Tyrone Gettis to speak on the campus on March 18, 1970. The request complied in all respects with the rules adopted by the three-judge District Court. There is no controversy with regard to the sufficiency or timeliness of the request.

Chancellor Fortune, after considering the request, notified *UMYD* that he would not approve the request. This disapproval was entered the day the request was received.

The evidence at the hearing developed that Chancellor Fortune received a similar request from *UMYD* on February 19, 1970, for Mr. Gettis to speak on the campus on February 26, 1970. When Chancellor Fortune received the first request he investigated Mr. Gettis and came to the conclusion that his appearance, as a guest speaker on the campus, would constitute a clear and present danger to the institution's orderly operation, because of the likelihood that Mr. Gettis would advocate damage to, or destruction of the institution's buildings and other property, or seizure of the same; or would advocate forcible disruption or impairment of, or interference with the institution's regularly scheduled classes or other educational functions, or, would advocate campus disorder of a violent nature. Having reached this conclusion, Chancellor Fortune entered his disapproval of the request. The request was later withdrawn by *UMYD*.

When the second request was received, Chancellor Fortune was in the position to act upon the request and he immediately entered his disapproval thereof.

After receiving notice of the disapproval of their request *UMYD* moved promptly pursuant to paragraph 5 of the Rules, to obtain a review of the denial by the Campus Review Committee. The request for review was in the form of a letter addressed to Chancellor Fortune. The letter suggested a de novo hearing at which certain ground rules would be followed, whereby both sides might have adequate opportunity to be heard.[3]

---

1. The opinion in the consolidated cases is reported in Stacy v. Williams, D.C., 306 F.Supp. 963 (1969).

2. The members of this club will be referred to in this opinion as "UMYD".

3. The letter is as follows:
 "Pursuant to the provisions of the Uniform Regulations promulgated by the U. S. District Court on December 1, 1969, the Ole Miss Young Democrats request that the Campus Review Committee be convened for a hearing de novo on the question of whether or not Tyrone Gettis

should be permitted to speak on the university campus. Attached to this letter is a copy of our request for permission to bring Mr. Gettis to the campus, which your office has denied.
 Since this will be the first time that the Campus Review Committee has been called upon to function, we respectfully suggest that the following ground rules be observed. First, the Campus Review Committee should function as a quasi-judicial body, although we certainly do not expect all of the formalities of the courtroom to be observed. Second, since

The Campus Review Committee, after hearing the matter, voted four to one to disapprove the request. The Committee notified *UMYD* of its decision on March 7, 1970.

Plaintiffs filed their complaint as a class action with the District Court on March 9, 1970, seeking a temporary restraining order, or temporary or permanent injunction directing the University officials and the Board of Trustees to approve the request to invite Mr. Gettis to speak on the campus, and enjoining said parties from interfering with the speech or those persons who might assemble to hear Mr. Gettis. The plaintiffs also seek an injunction to restrain the defendants from further interference with the rights of the students at the University to assemble peaceably and to hear speeches made by speakers of their choice; provided suitable campus facilities are available for such purposes on the date that such assemblages may be scheduled; and provided reasonable notice of such assemblages shall be given administrative officials of the University in order that adequate security measures may be taken. The plaintiffs request that the Court establish procedural guidelines for the operation of the Campus Review Committee to insure that the rights of plaintiffs and others similarly situated to administrative due process shall be fully protected in all future proceedings of the Campus Review Committee.

At the hearing defendants moved the Court ore tenus to dismiss the action because of the absence of indispensable parties, members of the Campus Review Committee. This motion was ovrruled by the Court as it is clear from the rules adopted by the three-judge District Court that the members of the Campus Review Committee are not indispensable parties to the action. The rules, in paragraph (5), provide that a judicial review of the action of the Campus Review Committee may be had by the sponsoring group "upon application to any court of competent jurisdiction, state or federal, by presenting its verified petition setting forth the grounds of complaint and giving adequate notice of such filing to the head of the institution". Thus, the rules provide that the head of the institution is the only indispensable party to such a review. In the case sub judice Dr. Fortune, the head of the University, is one of the party defendants. The Court is convinced that the motion is not well taken, and his action in overruling the motion was proper.

The defendants also questioned the right of the Court to proceed with the hearing, in view of the pendency of the consolidated action, aforesaid. The three-judge District Court provided in its final decree "that the Court retain jurisdiction for the enforcement of this order and all matters relating thereto".

The issue before the Court at the hearing involved the propriety of the issuance of a preliminary injunction to require University officials to approve the appearance of Mr. Gettis on the campus

the action of the Administration in denying our request deals with the area of speech and public assembly regulated by the First Amendment, the burden should be upon the Administration to prove by clear and convincing evidence that the request should be denied. The standards according to which the proof should be judged are (1) the opinion and order of the District Court dated December 1, 1969, (2) the Uniform Regulations, and, (3) the First Amendment.

Specifically, the Administration should first present its witnesses to prove that the request was properly denied. We should have the right to cross-examine those witnesses. Then we would have the right to present our witnesses who would also be subject to cross-examination. Once the hearing is concluded, the committee should retire and make its decision. We feel that it would be proper for the decision of the committee to be in writing, setting forth the reasons supporting the decision it makes.

We request that the hearings be held at 7 p. m. on Monday, March 9, 1970, at some suitable place. We will be represented by counsel at this hearing, and we expect the Administration to be represented by counsel if it so desires."

to speak under the sponsorship of *UMYD*. For the purpose of the hearing defendants' motion was not well taken, and the motion was overruled. The rules above mentioned provide that "Any sponsoring organization aggrieved by the action of the Campus Review Committee in denying the request may obtain judicial review thereof upon application to any court of competent jurisdiction, state or federal, by presenting its verified petition setting forth the grounds of complaint". [Paragraph (5)]. This provision evidenced the intention of the three-judge District Court that the Court would not retain jurisdiction of applications for review of Campus Review Committee actions.

There are some features of plaintiffs' action which appear to come within the retained jurisdiction of the three-judge District Court. The Court is of the opinion that this Court cannot undertake to amend the rules adopted by the three-judge District Court and establish procedural guidelines for the operation of the Campus Review Committee. Such action would come clearly within the jurisdiction retained by the three-judge District Court.

Neither is the Court authorized to enter an order prohibiting University officials from interference in the future with the rights of the students to assemble peaceably and to hear speakers of their choice, as is requested in the complaint. To assume jurisdiction of such an issue, would be tantamount to revoking the rules adopted by the three-judge District Court. The Court cannot entertain the consideration of such a matter.

The Court finds that the only matter which the Court can consider in the case sub judice is the propriety of the refusal of the University officials to permit *UMYD* to invite Mr. Gettis to speak on the campus, and allow the speech to be made under the sponsorship of *UMYD*.

The speech of Mr. Gettis was scheduled for March 18, 1970. It was shown at the hearing that another group of students were holding a meeting on the campus at that time which had overtones similar to those which might be created by the Gettis speech. Plaintiffs made it known to the Court at the first hearing herein that a later date could be arranged for the proposed speech, should it appear unwise to the Court for the two assemblages to occur at the same time. The Court refused to issue an order requiring the University officials to permit Mr. Gettis to speak on March 18th; but scheduled briefs and arguments for the Court's consideration on the question of whether the speech should be permitted at a later date.

The rules envision that the head of the institution must make the first determination of the suitability of the proposed speaker. In the event the request for permission to invite the speaker is denied, the sponsoring group may have the denial reviewed by the Campus Review Committee. The rules do not provide the procedure to be used by the head of the institution, in reaching the decision; nor, do the rules provide the procedure before the committee, except that on the review a "de novo consideration of the request" shall be given by the committee.

The Mississippi Supreme Court in Archer v. High, 1942, 193 Miss. 361, 9 So.2d 647, 648, in discussing a "de novo" hearing said "All appeals from a justice of the peace are heard de novo, which means such appeals 'are to be tried anew, as if never tried before.' "[4] Thus, it is the duty of the Campus Review Committee to consider a request anew, as if the head of the institution had never acted thereon.

The Court is presented with a difficult legal question. What effect, if any, must the Court give to the decision of the review committee? The defendants urge upon the Court that the decision of the Campus Review Committee is a decision made by an administrative agency, and the true function of the Court is not

4. See also: Black's Law Dictionary, Fourth Edition, page 483.

to substitute its judgment for that of the agency but to determine whether or not the agency has acted capriciously or arbitrarily, and, thus, has abused its authority and deprived someone of a substantial right.[5]

The Campus Review Committee did not make a record of the proceedings before the Committee. The only documentary evidence in the case originating in the Committee, is a letter written by the chairman to plaintiffs Webb and Cupit, representing *UMYD*, notifying them of the decision of the Committee.[6] It was, therefore, impossible to review the action of the Committee by a review of the record. It has been necessary to receive live testimony in order to review the actions of the Committee.

Plaintiffs complain that the review before the Campus Review Committee did not satisfy the requirements of due process of law. Defendants, in their brief, answer this complaint with the observation that such an issue is moot, because plaintiffs have been granted a de novo hearing by the Court.

 The Court must conclude that in the present posture of the case, the Court's role is to afford plaintiffs a de novo hearing on their request. In such a situation the Court must consider the request anew, as if it has never been considered before.

 On a de novo consideration of the request, the Court's action is subject to the rules of law applicable to issues such as the one presented in this case. The rights here involved are First Amendment Rights—the right to peaceably assemble, the right to speak, and the right to hear. First Amendment rights are not to be taken lightly and have been described as "sensitive rights". The right to hear is applicable to a state University.[7]

Chief Judge Keady said in Stacy[8], referring to First Amendment rights, as follows:

"Utmost care must be shown for the recognition of those rights, particularly since a regulation of this type undertakes to bar certain speech and thus becomes a limitation upon freedom of speech and assembly. Indeed, speaker regulations, *by their very nature,* constitute 'prior restraints' upon the freedoms of speech and assembly. Although the law presumes their invalidity, prior restraints are not unconstitutional per se."

The Court must conclude that the rules adopted by the three-judge District Court establishing the manner in which

---

5. In support of their contention defendants cite, Suess v. Pugh, 1965, U.S.D.C.N.D. West Virginia, 245 F.Supp. 661, 667, in which the court said:

"The true function of this Court in this review is not 'to substitute its opinion for that of any administrative agency duly authorized under Congress to administer its affairs,' but to determine whether or not such administrative agency has acted capriciously or arbitrarily or has abused its authority or deprived one of a substantial right recognized by law and that such agency has fully followed all of the rules, laws and regulations under which it functions. The Court, in cases of this nature, serves to act as a reviewing authority for the actions of an administrative agency but with no authority to substitute its opinion for that of such agency." (245 F.Supp. 667, 668)

6. This letter is as follows:
"Mr. Tom Webb 3/7/70
Mr. Danny Cupit
 representing the University of Misssissippi Chapter of Young Democrats:
Gentlemen:
 The Campus Review Committee to which you presented a request to invite Mr. Tyrone Gettis to address your group on the University of Mississippi campus has balloted four to one to disapprove your request, this 7 March 1970.
 Respectfully,
 /s/ Allen Cabaniss, C
 Allen Cabaniss, Chm.
 Campus Review Committee
 The University of Mississippi
 University, Miss. 38677"

7. Brooks v. Auburn University, 5 Cir. 1969, 412 F.2d 1171, 1172.

8. Stacy v. Williams, 1969, U.S.D.C.N.D. Miss.W.D., 306 F.Supp. 963, 971.

speakers may be invited and allowed to speak on the University campus constitute prior restraints on the exercise of First Amendment rights. The Supreme Court of the United States has held that "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity". Bantam Books v. Sullivan.[9]

The Supreme Court has also held that the operation and effect of the method by which speech is sought to be restrained must be subject to close analysis and critical judgment in the light of the particular circumstances to which it is applied.[10]

The Supreme Court said in Carroll v. President and Commissioners of Princess Anne:[11]

"Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.

The Court has emphasized that '[a] system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' * * * And even where this presumption might otherwise be overcome, the Court has insisted upon careful procedural provisions, designed to assure the fullest

presentation and consideration of the matter which the circumstances permit. As the Court said in Freedman v. Maryland, supra, [380 U.S. 51] at 58, 85 S.Ct. 734 [13 L.Ed.2d 649 at 654], a noncriminal process of prior restraints upon expression 'avoids constitutional infirmity only *if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.*" (emphasis added)

In the light of these decisions the issue submitted to the Court in this case must be considered de novo, that is anew, on the evidence presented at the hearing by the parties. It is also clear that the rules promulgated by the three-judge District Court constitute a system of prior restraints on the right of the sponsoring group to exercise the First Amendment rights of assembly and free speech.

 The Court holds that the burden of proof in this case rests upon defendants to show by clear and convincing evidence that the speech of Mr. Gettis will constitute a clear and present danger to the University's orderly operation because of the speaker's advocacy of the willful damage and destruction, or seizure and subversion, of the buildings or other property of the University; or

9. 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584, 593 (1963).

10. Speiser v. Randall, 1958, 357 U.S. 513, 520–521, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460, 1469–1470. Quotations from this case applicable to the case sub judice are: "When we deal with the complex of strands in the web of freedoms which make up free speech, the operation and effect of the method by which speech is sought to be restrained must be subjected to close analysis and critical judgment in the light of the particular circumstances to which it is applied. * * *
To experienced lawyers it is commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents. Thus the procedures by which the facts of the case

are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights. * * * Moreover, since only considerations of the greatest urgency can justify restrictions on speech, and since the validity of a restraint on speech in each case depends on careful analysis of the particular circumstances, cf. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, and Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095, both supra, the procedures by which the facts of the case are adjudicated are of special importance and the validity of the restraint may turn on the safeguards which they afford."

11. 393 U.S. 175, 181, 89 S.Ct. 347, 351–352, 21 L.Ed.2d 325, 331 (1968).

the forcible disruption or impairment of, or interference with, the regularly scheduled classes or other educational functions of the University, or the physical harm, coercion, intimidation, or other invasion of lawful rights, of the officials, faculty members or students of the University; or some other campus disorder of a violent nature. Nothing less than clear and convincing proof can suffice to deprive plaintiffs of their First Amendment rights.

The evidence shows that Tyrone Gettis has been or is now the president of the student body of the Mississippi Valley State College. The student body of the college is all black. Mr. Gettis is a member of the Negro race.

Prior to the disruptions at the college, hereafter mentioned, the enrollment was approximately two thousand students. During the months of January and February 1970, the student body staged almost continuous demonstrations in support of numerous demands made by them upon college officials. It is not necessary to detail the nature and extent of the demonstrations except to say that as a result of the students' boycott of classes and demonstrations the officials closed the college for a time. Later the college was opened for new registration. As a result of the action by college officials a large number of students did not return to school.

Mr. Gettis was a leader in the student revolt, and assumed an active part therein. On one occasion a faculty meeting at the college was interrupted. Mr. Gettis is shown to have abusive language toward one of the officials. On another occasion, the students forceably occupied a building on the campus and held a meeting there. Mr. Gettis is shown to have threatened a campus police officer with bodily harm. Rocks were thrown on occasions. The students stopped an automobile and tried to turn it over. It is sufficient to say that there were numerous incidents of campus disorder and interruption of regularly scheduled classes and other educational functions.

Some of the college property was damaged, though only to a slight degree.

The evidence did not show that Mr. Gettis personally destroyed or damaged any property, or harmed any person. It was shown, however, in fact, admitted by plaintiffs, that Mr. Gettis was one of the leaders of the demonstrations, and student revolt.

The University of Mississippi has a student body in excess of six thousand students, of which not more than two hundred are black students.

There has not been a disturbance of major importance on the University campus since the Meredith incident in the early sixties. However, a short time before Chancellor Fortune received the first request from *UMYD* for Mr. Gettis to speak on the campus, there were two or three incidents of a minor nature involving black students. On one occasion a concert or musical at the chapel was interrupted by black students. These students went uninvited upon the stage. At about that same time a group of black students appeared on the Chancellor's lawn demanding an audience with him. Some of the students in the group used profane and obscene language. These incidents indicated unrest among the black students on the campus.

When the first request for Mr. Gettis to speak on the campus was received by Chancellor Fortune, he was aware of the unrest of the black students, on the campus. He initiated an investigation of Mr. Gettis in order to determine whether the request should be honored. Newspaper clippings concerning the incidents on the campus of Mississippi Valley State College were obtained and reviewed. Chancellor Fortune talked with college officials about the matter. After reviewing the evidence received from these sources, Chancellor Fortune determined that the proposed speech of Mr. Gettis, would constitute a clear and present danger to the University's orderly operation in the particulars above outlined, especially in view of the black student unrest.

The evidence shows that before *UMYD* initiated the request, one of the attorneys for *UMYD* visited Mr. Gettis at Itta Bena and talked with him about the proposed speech. Mr. Gettis intended to speak on a student's viewpoint of the crisis existing at Mississippi Valley State College. The members of the *UMYD* were interested in having a first hand report of the matter. The revolt had been given wide newspaper, radio and television coverage. Mr. Gettis assured the attorney that his speech would be devoted entirely to the assigned subject.

Thereafter, several of the members of the *UMYD* talked with Mr. Gettis by telephone and were given the same assurance. One member of the group visited the campus of Mississippi Valley State College to evaluate the problem first hand.

At the hearing the plaintiffs introduced, as witnesses, the above mentioned attorney and three members of *UMYD* who testified to facts substantially as hereinbefore stated. They also introduced as witnesses a student member of the Ole Miss M Club (football), who is not a member of *UMYD*, one of the leaders of the black students at the University and three members of the University faculty. One of the faculty members is a professor of English at the University, and the other two are professors in the School of Law. Each witness testified that he was conversant with the situation at the University and, in his opinion, the appearance of Mr. Gettis on the campus would not in any manner constitute a clear and present danger to the orderly operation of the University.

The defendants introduced the vice-president of the Mississippi Valley State College, a member of the college campus police force, and Chancellor Fortune as witnesses to sustain the viewpoint of the University. Chancellor Fortune testified in regard to the investigation of Mr. Gettis by his office, and gave his reasons for arriving at the conclusion that the request of *UMYD* to invite Mr. Gettis to the campus should not be approved. Chancellor Fortune determined that the proposed speech by Mr. Gettis would constitute a clear and present danger to the University's orderly operation in the particulars above mentioned. Chancellor Fortune was not fearful that Mr. Gettis' appearance on the campus would result in disorders such as occurred at Mississippi Valley State College. He testified that he was fully cognizant of the fact that the student body at the University involved a much larger group than did that at Mississippi Valley State College, and that only a few of the students at the University were black, while all of the students at the college were black students. Chancellor Fortune expressed the opinion that the University had ample resources to control any disorder which might occur on the campus. Chancellor Fortune's main concern was to avoid a disturbance of any nature.

The vice-president and police officer from Mississippi Valley State College testified in regard to the campus revolt of which Mr. Gettis was one of the leaders.

The Court must consider the evidence in its entirety and decide whether clear and convincing evidence has been introduced to demonstrate that Mr. Gettis' speech, should it occur, will constitute a clear and present danger to the orderly operation of the University. In making this test the Court is guided by the opinion of the three-judge District Court in Stacy, supra, wherein the Court said: [12]

"In *Dennis*, the Supreme Court made an exhaustive review of all of the cases involving application of the clear and present danger test for suppressing speech and concluded by adopting Chief Judge Learned Hand's interpretation of the phrase: 'In each case, [Courts] must ask whether the gravity of the "evil," discounted by its im-

12. 306 F.Supp. at 971.

probability, justifies such invasion of free speech as is necessary to avoid the danger.' (United States v. Dennis, 2 Cir., 183 F.2d 201, at p. 212)."

The question presented here is whether there is a reasonable probability that Mr. Gettis would advocate in his speech the willful damage or destruction, or seizure and subversion, of the buildings or other property of the University, or the forcible disruption or impairment of, or interference with, regularly scheduled classes or other educational functions of the University, or other campus disorders of a violent nature. Advocacy, as used here, means preparing the group addressed for imminent action and steeling it to such action, as opposed to the abstract espousal of the moral propriety of a course of action by resort to force, and there must be not only advocacy to action but also a reasonable apprehension of imminent danger to the essential functions and purposes of the University.

It appears clear to the Court that Mr. Gettis' appearance on the campus would not present a clear and present danger to the orderly operation of the University. In the first place, Mr. Gettis proposes to limit his speech to a discussion of the crisis at Mississippi Valley State College, as viewed by him as a student leader. However, should Mr. Gettis extend his remarks so as to advocate the destruction or damage of University property, or the seizure of its buildings, or other campus disorder of a violent nature, there does not appear to be a reasonable probability that such would happen. This conclusion is especially true when the probability is viewed in the light of the nature and racial composition of the student body at the University.

The Court is of the opinion that the Campus Review Committee erred in disapproving the request by *UMYD* for permission to invite Mr. Gettis to speak on the University campus. The decision of the committee will be reversed and University officials will be directed to approve the request.

The decision in this case is not to be considered as critical of Chancellor Fortune or the Campus Review Committee. The Court is positive that they acted in good faith and in accord with that which they thought would be for the best interest of the University. However, the Court feels that Chancellor Fortune and the Campus Review Committee were overly cautious in their actions and that the danger of disorder at the University resulting from Mr. Gettis' speech, is not real or apparent.

The students at the University should not be deprived of the right to hear speakers espousing controversial matters except in cases where it is clear that the speakers will constitute a clear and present danger to the orderly operation of the University. In the opinion of the Court, the case sub judice is not such a case.

### APPENDIX

UNIFORM REGULATIONS FOR OFF-CAMPUS SPEAKERS INVITED BY ORGANIZED STUDENT AND FACULTY GROUPS APPLICABLE TO ALL INSTITUTIONS OF HIGHER LEARNING WITHIN THE STATE OF MISSISSIPPI

The freedoms of speech and assembly guaranteed by the first and fourteenth amendments to the United States Constitution shall be enjoyed by the students and faculties of the several Institutions of Higher Learning of the State of Mississippi as respects the opportunity to hear off-campus, or outside, speakers on the various campuses. Free discussion of subjects of either controversial or noncontroversial nature shall not be curtailed.

However, as there is no absolute right to assemble or to make or hear a speech at any time or place regardless of the circumstances, content of speech, purpose of assembly, or probable consequences of such meeting or speech, the

issuance of invitations to outside speakers shall be limited in the following particulars, but only in the manner set forth herein:

(1) A request to invite an outside speaker will be considered only when made by an organized student or faculty group, recognized by the head of the college or university;

(2) No invitation by such organized group shall issue to an outside speaker without prior written concurrence by the head of the institution, or such person or committee as may be designated by him (hereafter referred to as his authorized designee), for scheduling of speaker dates and assignment of campus facilities;

(3) Any speaker request shall be made in writing by an officer of the student or faculty organization desiring to sponsor the proposed speaker not later than ten calendar days prior to the date of the proposed speaking engagement. This request shall contain the name of the sponsoring organization, the proposed date, time and location of the meeting, the expected size of the audience and topic of speech. Any request not acted upon by the head of the institution, or his authorized designee, within four days after submission shall be deemed granted;

(4) A request made by a recognized organization may be denied only if the head of the institution, or his authorized designee, determines, after proper inquiry, that the proposed speech will constitute a clear and present danger to the institution's orderly operation by the speaker's advocacy [1] of such actions as:

1. The violent overthrow of the government of the United States, the State of Mississippi, or any political subdivision thereof; or

2. The willful damage or destruction, or seizure and subversion, of the institution's buildings or other property; or

3. The forcible disruption or impairment of, or interference with, the institution's regularly scheduled classes or other educational functions; or

4. The physical harm, coercion, intimidation, or other invasion of lawful rights, of the institution's officials, faculty members or students; or

5. Other campus disorder of a violent nature.

In determining the existence of a clear and present danger, the head of the institution, or his authorized designee, may consider all relevant factors, including whether such speaker has, within the past five years, cited violence resulting in the destruction of property at any state educational institution or has willfully caused the forcible disruption of regularly scheduled classes or other educational functions at any such institution.

(5) Where the request for an outside speaker is denied, any sponsoring organization thereby aggrieved shall, upon written application to the head of the institution, or his authorized designee, obtain a hearing within two days following the filing of its appeal before a Campus Review Committee, composed of three faculty members and two students of the institution, for a de novo consideration of the request. The Campus Review Committee shall have power to grant or deny the request; and its decision shall be final, unless judicial review is sought

---

1. Advocacy, as described above, means preparing the group addressed for imminent action and steeling it to such action, as opposed to the abstract espousal of the moral propriety of a course of action by resort to force; and there must be not only advocacy to action but also a reasonable apprehension of imminent danger to the essential functions and purposes of the institution.

as hereinafter provided. If such request is neither granted nor denied within said two-day period, it shall be deemed granted, and the speaker's invitation shall issue. The three faculty members to serve on the Campus Review Committee shall be appointed at each institution for a one-year term beginning September 1 of each calendar year, and this apppintment shall be made by the President of the Board of Trustees of the Institutions of Higher Learning. The two student members on the Campus Review Committee shall be the president and secretary of the student body of each institution, and they shall serve only as long as they hold those student offices.

Any sponsoring organization aggrieved by the action of the Campus Review Committee in denying the request may obtain judicial review thereof upon application to any court of competent jurisdiction, state or federal, by presenting its verified petition setting forth the grounds of complaint and giving adequate notice of such filing to the head of the institution. Upon a hearing to be conducted as soon as practicable, and at such time and place as the court may prescribe, the court shall either reverse or affirm the decision of the Campus Review Committee as may be proper under the law and facts.

(6) Where the request for an outside speaker is granted and the speaker accepts the invitation, the sponsoring organization shall inform the head of the institution, or his authorized designee, in writing immediately of such acceptance. The head of the institution, or his authorized designee, may, in his discretion, require that the meeting be chaired by a member of the administration or faculty, and he may further require a statement to be made at the meeting that the views presented are not necessarily those of the institution or of the sponsoring group. By his acceptance of the invitation to speak, the speaker shall assume full responsibility for any violation of law committed by him while he is on campus.