Ernest **MANDEL**, David **Mermelstein**, **Wassily Leontief**, Norman **Birnbaum**, **Robert L. Heilbroner**, **Robert Paul Wolff**, **Louis Menashe**, **Noam Chomsky**, **and Richard A. Falk, Plaintiffs**,

v.

John M. **MITCHELL**, Attorney General of the United States, **William P. Rogers**, Secretary of State, **Defendants**.

No. 70 C 344.

United States District Court, E. D. New York.

March 18, 1971.

Leonard B. Boudin, New York City (Rabinowitz, Boudin & Standard and David Rosenberg, New York City, of counsel) for plaintiffs.

Lloyd H. Baker, Islip, N. Y. (Edward R. Neaher, U. S. Atty. of counsel) for defendants.

Before FEINBERG, Circuit Judge and BARTELS and DOOLING, District Judges.

DOOLING, District Judge.

The suit seeks a declaratory judgment that on its face and as applied Section 212(a) (28) and (d) (3) (A) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a) (28) (d) (3) (A) is unconstitutional. Section 212(a) (28) of the Act declares ineligible for visas and excludes from admission to the United States aliens who are or at any time were members of described classes of aliens identified with certain leftist and extremist political doctrines; Section 212 (d) (3) (A) authorizes the temporary admission of an ineligible and excluded alien in the unbounded discretion of the Attorney General after the Attorney General approves a recommendation of the Secretary of State or the consular officer that the alien be admitted temporarily despite his ineligibility. Plaintiff Mandel, who had been admitted in the Attorney General's discretion exercised under Section 212(d) (3) (A) in 1962 and 1968, was denied admission in 1969 on the ground that the consular officer had found him ineligible for a visa "because his subversive affiliations," and his "flagrant abuse of the opportunities afforded him to express his views in this country" during his 1968 visit made a favorable exercise of the discretion to admit him unwarranted.

Plaintiff Mandel is joined in his suit by professors of institutions of higher education some of whom had invited him to speak on specified dates in 1969 at specified colleges or universities and at three conferences. Alleging that the plaintiff professors and other citizens desire to have Mandel speak at universities and other forums to hear his views and engage in "free and open academic exchange," that they have to that end invited him to participate in a series of university conferences and public forums, that Mandel has accepted the invitation and that clearing his admissibility in advance of again setting up a schedule of appearances is necessary, plaintiffs charge that Section 212(a) (28) and (d) (3) (A) of the Act is invalid under the First and Fifth Amendments as imposing a prior restraint on constitutionally protected communication, predicating exclusion on belief and advocacy not allied with "unlawful speech or conduct," denying the equal protection of the law in excluding leftists but not rightist extremists, failing to provide due process safeguards for determining ineligibility, and failing to provide standards for the exercise of the Attorney General's discretion to exclude, and, that in the particular case of Mandel, the Secretary and Attorney General have acted arbitrarily without evidence sufficient to support a finding of ineligibility, or to furnish a basis for rejecting the Secretary's recommendation that Mandel be admitted temporarily.

Plaintiffs move for a preliminary injunction restraining the Attorney General and Secretary of State from enforcing Section 212(a) (28) and (d) (3) (A) of the Act as against plaintiffs. Since the injunction sought would restrain the enforcement, operation or execution of an Act of Congress for repugnance to the Constitution, a three judge court is required to pass on the motion and has been designated by the Chief Judge of the Second Circuit, 28 U.S.C. §§ 2282, 2284.

It is concluded that plaintiffs are entitled to the preliminary injunction they seek.

The parties agree that there is no relevant controversy on the facts, and that

the facts presented lead directly to the heart of the questions of "standing" and validity that the case presents.

Ernest Mandel is a citizen of Belgium, editor-in-chief of the Belgian Left-Socialist weekly LA GAUCHE, and the author of a two volume text entitled "Marxist Economic Theory" published in 1969. It appears not to be denied that Mandel can correctly be categorized as "an orthodox Marxist of the Trotskyist school," and, in a speech, said to have been given by tape recording at a conference in New York on November 29, 1969, Mandel described himself as "an exponent" of the doctrine of Karl Marx. The text of the speech is resolutely Marxist in its claims (e. g., referring to the trend of working-class initiatives in Western Europe as indicating revolutionary potential, the text continues "And this is why a revolutionary strategy in the Marxist sense of the word is both possible and indispensable, if the new upsurge of working class militancy which is now in full swing in Europe is not to end in defeat as it did in the previous three main periods of upsurge: that at the end of World War I; that during the mid-thirties; and that at the end of World War II"). The speech concludes, in a passage that at once exemplifies Mandel's academic advocacy of revolutionary doctrine and marks its difference from incitement to subversive action:

> "This conclusion brings us back to the starting point. What are the agencies of social change in the West today? It is the basic thrust of the productive forces themselves, undermining, eroding, and shaking periodically in a violent way private property, the nation-state, and generalized market economy. It is the inevitable periodic explosions of labor's discontent against its alienation as producer, against the capitalist relations of production at plant level, locally, regionally, or nationally. It is the reemergence of revolutionary consciousness in the youth through the transmission belts of the colonial revolution, the student revolt, the rise of a new genera-

tion of revolutionary teachers, scientists, technicians, and intellectuals. It is the potential fusion of that revolutionary consciousness with large masses of workers through campaigns and actions for transitional demands, culminating in workers' control of production. And it is the building of the revolutionary party and the revolutionary International. The better we succeed in combining all these elements, the closer we shall be to a socialist world and to the emancipation of labor and of all mankind! "

It is not claimed that Mandel is a member of the Communist Party or its affiliates, and Mandel has asserted on his visa applications that he is not.

Mandel had been admitted to the United States in 1962 (as a working journalist) and again in 1968, on both occasions—although the Department of State concedes that the fact was not brought home to him—after a finding of political ineligibility and an exercise in his favor of the Attorney General's discretion to admit him temporarily under Section 212(d) (3) of the Act on recommendation of the Department of State. During his 1968 visit Mandel accepted speaking engagements at more than 30 universities or colleges in the United States and Canada (including Harvard, Swarthmore, Antioch, Michigan, Notre Dame and Berkeley); he was at Columbia three times, at the University of Pennsylvania twice, and spoke at the Socialist Scholars Conference at Rutgers. His visit apparently extended from early September until November.

In 1969 Mandel was invited to participate in a conference on "Technology and the Third World" at Stanford University on October 17 and 18 as a speaker and as a panelist to discuss a speech to be given by Professor John K. Galbraith of Harvard; he was the recipient also of faculty requests to speak or lecture during his visit at several universities or colleges including Princeton, Amherst, the New School, Columbia and Vassar, of a student-group request to participate in a conference on social and

economic conversion to the demands of a peace-oriented society at Massachusetts Institute of Technology, and he was to speak at a conference arranged by the Bertrand Russell Peace Foundation and the Socialist Scholars Conference on "Agencies of Social Change," his individual subject to be "Revolutionary Strategy in the Imperialist Countries."

Mandel applied in Brussels for a visa on September 8, 1969, to attend the Stanford conference, to leave for the United States on October 14 and stay six days. He was told orally on October 23 and by letter of October 30, 1969, that a visa and waiver had been refused; the letter explained that he had been ruled ineligible for admission under Section 212(a) (28) in 1962, that in 1962 and in 1968 upon Embassy recommendation the Department of State had exercised its discretion to grant temporary admission under Section 212(d) (3), but that the waiver requested of Washington in September had been denied. The Consul advised that a second request for waiver was being forwarded in connection with Mandel's new-filed application of October 22 for a visa to lecture and attend conferences at various institutions. A State Department letter of November 6, 1969, to plaintiffs' counsel explained that the earlier "waivers" were conditioned on conformity to the itinerary, activities and purposes stated in the visa application, that in 1968 Mandel had engaged in activities beyond the stated purposes of his trip, that on that ground a waiver had not been sought on the September visa application but that since Mandel may not have known the conditions on which the earlier visas had been issued, and had now engaged to conform to his stated itinerary and purposes, the Department was reconsidering his case and discussing it with the Department of Justice. On January 27, 1970, the Department of State advised the Bertrand Russell Peace Foundation that the Department of State

" * * * in the interest of free expression of opinion and exchange of ideas, [had] recommended a waiver

for Mr. Mandel. The Immigration and Naturalization Service (acting for the Attorney General) responded that a waiver was not warranted."

By letter of February 13, 1970, the Department of Justice (Immigration and Naturalization Service) advised plaintiffs' counsel, after explaining the earlier determination that Mandel "was ineligible * * * because of his subversive affiliations," that

"On his last visit in 1968, Mr. Mandel's entry was authorized for a series of academic engagements in the United States. His activities, while here, were much reported to the press and went far beyond the stated purposes of his trip, on the basis of which his admission had been authorized and represented a flagrant abuse of the opportunities afforded him to express his views in this country.

"Accordingly, when the recent recommendation was made that he be permitted to enter for a third time, it was concluded that the favorable exercise of discretionary authority provided under the Immigration and Nationality Act was not warranted and his temporary admission was not authorized. There is no basis for changing this determination."

The plaintiffs other than Mandel are citizens of the United States who had issued invitations to Mandel in 1969 (*i. e.*, plaintiffs Birnbaum, Heilbroner), or were to participate in programs in which Mandel was also invited to participate (*i. e.*, Chomsky), or wish to have Mandel speak at universities and other forums. It is alleged that plaintiffs are unable to set dates for a program of appearances because Mandel's eligibility status make it impossible to assure his appearance. Plaintiffs have on that basis joined Mandel in the present suit to enjoin enforcement against him of the exclusion provision on constitutional grounds.

The Government opposes the motion on the ground, not challenged, that Mandel is an advocate of the "economic, international and governmental doctrines of

world communism" and therefore ineligible to receive a visa under Section 212 (a) (28) (D) and also an alien who writes and publishes matter advocating and teaching the doctrines of world communism and therefore ineligible to receive a visa under Section 212(a) (28) (G) (v). The Government's position is that the Attorney General is not required to have factual support for or to justify his discretionary decision not to grant temporary admission since the power to exclude is absolute and waiver of exclusion purely a matter of grace.

To determine the ultimate issue in the case and the dependent issue of "standing" requires first an analysis of the substantive content of Section 212(a) (28) in its relation to the First Amendment, and then a consideration of the effect of the statute's operating only to define occasions for a discretionary exercise of the plainly sweeping power to exclude aliens (Boutilier v. Immigration & Naturalization Service, 1967, 387 U.S. 118, 123–124, 87 S.Ct. 1563, 18 L.Ed.2d 661; United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542–544, 70 S.Ct. 309, 94 L.Ed. 317). Section 212(a) (28) is one lengthy part of a set of exclusions and definitions in the Act all of which bear to some extent on the interpretation of Section 212(a) (28). The relevant parts of Sections 101(a) (37), (40), 212(a) (9), (10), (27), (28), (29), (d) (3), 5), (6), 235(c) (8 U.S.C. §§ 1101(a) (37), (40), 1182(a) (9), (10), (27), (28), (29), (d) (3), (5), (6), 1225 (c)) are given in the Appendix.

Subsection (a) (28) treats as substantively evil political doctrines, associations and activities (A) anarchy, (B) opposition to all organized government, (C) the Communist Party of the United States, any other totalitarian party of the United States, the Communist Political Association, and their local counterparts, (D) the economic, international, and governmental doctrines of world communism and (F), (G), (i) the overthrow by force, violence or other unconstitutional means of the Government of the United States or of all forms of law, (ii) the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally), (iii) the unlawful damage, injury, or destruction of property, (iv) sabotage, and (v) the establishment in the United States of a totalitarian dictatorship. The existence of valid Governmental power to prevent by anticipation the translation of the proscribed doctrines into the forbidden subversive activities may be considered established at least at the extreme of likely incitement to or production of subversive action, for at that point pure communication is not involved, but the verbal steps that set attack in train are being taken. Dennis v. United States, 1951, 341 U.S. 494, 508, 510–512, 545, 71 S.Ct. 857, 95 L.Ed. 1137 (concurring opinion); Yates v. United States, 1957, 354 U.S. 298, 324–325, 340, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (Black, J., concurring and dissenting); Brandenburg v. Ohio, 1969, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430; cf. Scales v. United States, 1961, 367 U.S. 203, 228–229, 81 S.Ct. 1469, 6 L.Ed.2d 782. Subsection (a) (28), however, is explicit in its selective direction against that which is specifically not active subversion but belief and preachment. It operates not only against present adherence to disfavored political doctrines, associations and programs but also against any past adherence to them. It embraces not advocacy alone but teaching as well, and any affiliation with any organization that either advocates or teaches the doctrines or programs. It reaches not only personal advocacy or teaching but also either writing or publishing or wittingly circulating or printing or displaying (or possessing for any of those purposes) any printed or written matter advocating or teaching the disfavored doctrines or programs; beyond that it extends to membership in or affiliation with any organization so resorting to the printed or written word or its circulation. Present or past Communist party membership or affiliation are also embraced in the subsection.

The Government points to Subsection (a) (28) (D) and (G) (v) as particularly applicable to Mandel. The first part, (a) (28) (D) defines a class whose members are neither anarchists, nor advocates or teachers of opposition to all organized government, nor members of or affiliated with any organization that advocates or teaches that doctrine, nor a member of or affiliated with any Communist or Totalitarian Party (or their predecessor or successor organizations) but who are, or at any time have been, advocates of the economic, international, and governmental doctrines of world communism or advocates of the establishment in this country of totalitarian dictatorship, or who are members of or affiliated with any organization that advocates such communism or totalitarianism either through its own utterances or through publications it either issues or permits or authorizes or finances. The second part, (G) (v), describes those who are or ever have been members of the class of aliens who write or publish, or knowingly circulate, print, display (or possess for those purposes) any written or printed matter advocating or teaching the economic, international, and governmental doctrines of world communism or advocating or teaching the establishment in this country of a totalitarian dictatorship. Because the strictures of the statute thus calculatedly fall precisely upon teaching and advocacy as such, they are, unless their presence in an alien exclusion code alters the result, invalidated by the First Amendment. Brandenburg v. Ohio, 1969, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430; United States v. Robel, 1967, 389 U.S. 258, 262, 88 S.Ct. 419, 19 L.Ed.2d 508.

█ The statutory strictures are not relieved of the directness of their impact on interests protected by the First Amendment because they do no more than add to the number of the aliens who may be excluded. In the context in which Section 212(a) (28) functions it operates to exclude only aliens who by every other statutory standard of admissibility are not excludable; it excludes them not for any reason related to their alienage but solely for their present or former political associations, or doctrines, or advocacies, or teachings. The sole and selective effect of the statute is to operate as a means of restraining the entry of disfavored political doctrine, and it is a forbidden enactment. Lamont v. Postmaster General, 1965, 381 U.S. 301, 305, 85 S.Ct. 1493, 14 L.Ed.2d 398; Cf. Near v. Minnesota, 1930, 283 U.S. 697, 713–721, 51 S.Ct. 625, 75 L.Ed. 1357; Aptheker v. Secretary of State, 1964, 378 U.S. 500, 510–511, 84 S.Ct. 1659, 12 L.Ed.2d 992; Shuttlesworth v. City of Birmingham, 1969, 394 U.S. 147, 150–151, 89 S.Ct. 935, 22 L.Ed.2d 162.

The subsection does not deal with subversive activities. Subsections (a) (27) and (a) (29) deal with "activities." Subsections (a) (27) excludes aliens who, it is officially believed, seek to enter "solely, principally, or incidentally" to engage in activities prejudicial to the public interest or to endanger the welfare, safety or security of the United States. Subsection (a) (29) excludes aliens who, it is officially believed, "probably would, after entry," either (A) engage in activities prohibited by the laws of this country relating to "espionage, sabotage, public disorder, or in other activity subversive to the national security," or (B) "engage in any activity the purpose of which is the opposition to, or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means." Subsection (d) (3) operatively contrasts subsection (a) (28) with subsections (a) (27) and (a) (29). Subsection (d) (3) pointedly withholds the discretionary power of temporary admission from the Secretary of State and the Attorney General in the case of aliens inadmissible under Subsection (a) (27) and (a) (29). (They may be paroled into the country temporarily "for emergent reasons or for reasons deemed strictly in the public interest." See subsection (d) (5)).

The effect of Subsection (a) (28) on interests protected by the First Amend-

ment is not here an unintended and tolerable effect of a valid exercise of a power of Government directed to an end other than limitation of First Amendment rights. That was the case in United States v. O'Brien, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672: fair and effective exercise of the power of conscription required registration of those eligible for conscription and their identification; thence flowed the power to forbid mutilation or destruction of Selective Service certificates notwithstanding that particular acts of destruction might be intended as dramatic communications of the registrants' political opposition to the Vietnam hostilities (391 U.S. at 381–382, 88 S.Ct. 1673); the terms of the statute did not limit its penal sanction to the cases of "symbolic speech" but, conspicuously, comprehended furtive destruction by draft evaders or others. So too in Teague v. Regional Commissioner, 2d Cir. 1968, 404 F.2d 441, cert. denied, 1969, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (three justices dissenting, two in an opinion of Mr. Justice Black) the statute and regulations were addressed to withholding American currency from areas with which the Government had, under the Trading with the Enemy Act, suspended substantially all trade except under license; the control scheme was held not invalid as it applied to publications since it was not addressed to restricting the flow of ideas and only incidentally burdened that flow, nor did it select publications according to their content for restriction.

In the present case the impact of subsection (a) (28) on interests protected by the First Amendment is not outweighed by any compensating protection it gives against an evil shown to be grave to some interest clearly within the sphere of governmental concern. Cf. Speiser v. Randall, 1958, 357 U.S. 513, 527, 78 S.Ct. 1332, 2 L.Ed.2d 1460. Where a distinct governmental interest of importance is sought to be subserved and effective pursuit of it involves a calculated sacrifice of First Amendment interests that could not otherwise be found valid, the importance of the governmental interest weighed against the degree of First Amendment loss may, it has been thought, be found on balance to justify a limited sacrifice of the First Amendment interest. American Communications Association v. Douds, 1950, 339 U.S. 382, 392–400, 70 S.Ct. 674, 94 L.Ed. 925; Konigsberg v. State Bar of California, 1961, 366 U.S. 36, 50–51, 81 S.Ct. 997, 6 L.Ed.2d 105. But United States v. Robel, 1967, 389 U.S. 258, 264–268, 88 S.Ct. 419, 19 L.Ed.2d 508 (and see footnote 20), if it does not altogether reject such analysis, confines it narrowly, and seems at minimum to exact a demonstration that there was no reasonable alternative, and that the statute has the least drastic impact on First Amendment interests that the circumstances admit. Subsection (a) (28), however, is not within the class of enactments to which the "balancing" test could apply. The power to exclude aliens is not questioned: there is not here any distinct aim of the exercise of that power that is primary and to the attainment of which the restraint of First Amendment interests is sacrificed in a secondary or mediating exercise of power. Here the substance of the exercise of the power is the restraint on interests protected by the First Amendment.

The further question is whether the strictures of subsection (a) (28), although such strictures are forbidden as part of domestic law, may nevertheless be valid when used to classify aliens and exclude them absolutely or conditionally; it might be supposed that if the ultimate evil guarded against—violent revolution or subversion by revolutionary communism—were peculiarly connected with alien sources and peculiarly likely to be activated by alien emissaries, such considerations might justify an abridgement of freedom of speech, press and assembly at a point well before they could be shown to be instances of present incitement. United States ex rel. Turner v. Williams, 1904, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979, sustained the deporta-

tion of a resident alien where evidence before the board of inquiry supported the conclusion that Turner was an anarchist in the popular sense of being one who believed in or advocated the overthrow of the government or of all government by force or the assassination of officials, and the Court was unable to say (194 U.S. at 294, 24 S.Ct. at 724) "that the inference was unjustifiable either that he contemplated the ultimate realization of his ideal by the use of force, or that his speeches were incitements to that end." But Mr. Chief Justice Fuller indicated that the national interest in self-preservation warranted the Congress, despite the First Amendment, in excluding philosophical anarchists, innocent of evil intent, if the Congress was of opinion that the tendency of the general exploitation of such views was so dangerous to the public weal that aliens holding and advocating such views should not be added to the population. Mr. Justice Brewer put his concurrence on the narrow ground that the evidence supported a deduction that Turner was an anarchist in the sense of "one who urges and seeks the overthrow by force of all government." Cf. Dennis v. United States, supra, 341 U.S. at 509–515, 71 S.Ct. 857, 95 L.Ed. 1137. If Turner were thought to imply that a different and looser test of First Amendment validity can be applied in alien deportation and exclusion cases, Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 591–592, 72 S.Ct. 512, 96 L.Ed. 586, appears clearly to assume that such cases must meet the standard of Dennis; the Court did not rely upon Turner (which was cited to it) nor invoke the argument (made to it) that the power to expel aliens is an attribute of sovereignty essentially relating to foreign affairs and national safety and, therefore, not restricted impliedly by provisions of the Constitution which do not expressly relate to it. More clearly, Aptheker v. Secretary of State, 1964, 378 U.S. 500, 510–512, 84 S.Ct. 1659, 12 L.Ed.2d 992, imposed the Dennis standard in a cognate field to invalidate passport control of the travel of citizens identified as members of the Communist Party. Cf. Kent v. Dulles, 1958, 357 U.S. 116, 130, 78 S.Ct. 1113, 2 L.Ed.2d 1204. So, in the equally if not more sensitive area of employment in defense industry, absence of the Dennis limitations was fatal to the effort to exclude members of organizations operating primarily to advance the objectives of the world Communist movement. United States v. Robel, supra, 389 U.S. at 262–268, 88 S.Ct. 419; cf. Shelton v. Tucker, 1960, 364 U.S. 479, 486–487, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (cannot require public school teacher to disclose all associational ties despite recognized state concern for teacher competence and fitness).

That the Congress and the states have been steadily concerned with the threat of international world communism and with anarchistic doctrine that connotes revolution against all government would appear to be a consequence of the doctrines' uncompromising inclusion as a critical element—and as their distinguishing element—of the teaching that a resort to revolution is necessary, that subversion of existing government by force and violence is a necessity. The doctrines are viewed as teaching and are denounced because they affirmatively teach that it is futile to aspire to alter the plan of government or its programs through the means of representative government and that the entire frame of government, including its basic constitution, must be uprooted by the forcible seizure of the total power to govern. Although the nature of the doctrines explains the degree and persistence of legislative concern with them, the First Amendment has been held nonetheless to exact a dichotomy between the protected freedom to preach the doctrines thus legislatively pronounced to be abhorrent to the nation's free institutions and the punishable illegality of taking significant action to initiate subversion and revolution. The difficulty and the necessity of drawing that fundamental distinction appears no less from Dennis and Yates than from Communication Workers and

*Robel.* The nature of the First Amendment in its relation to the basis of government under the Constitution explains the distinction, the reason why the Amendment must prevail as well in the context of the power to exclude aliens and the reality of the plaintiffs' standing to challenge the subsection in the present action.

New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686, marks the emergence in clarity of the view of the First Amendment as a fundamental principle of the form of American constitutional government; accepting the premise that the people, not the government, possess the sovereignty, and that by the First Amendment they emphasized the withholding from the federal government of the power to make laws affecting (in *Sullivan*) the freedom of the press, the Court considered that the power was denied as well to the states by the Fourteenth Amendment's incorporation of the First Amendment. The Court found in the turbulent history of the Sedition Act of 1798 the first crystallization of national awareness of the central meaning of the First Amendment, and that the right of free public discussion of the stewardship of public officials was, as Madison had then asserted, a fundamental principle of the American form of government (376 U.S. at 273–278, 84 S.Ct. 710). The Court quoted Madison's sharp comment, earlier, in 1794, that "the censorial power is in the people over the Government, and not in the Government over the people." That comment was made in course of an extended debate in the House on a motion to include in a response to President Washington's report of the military steps he had taken to put down the so-called "Whisky Rebellion," a "reprobation" of the role in the rebellion of certain "self-created societies" (4 Annals of Congress, pp. 899, 946, [1794]); President Washington had charged "certain self-created societies" with attempting to help defeat the operation of the excise tax by "assuming the tone of condemnation" (4 Annals of Congress, p. 788). The motion to include the censure of the self-created societies was overwhelmingly defeated (4 Annals of Congress, p. 945) despite arguments that such a vote might appear to deny support to the President and that mere censure of utterance did not imply or rest on a presumption of power to legislate against such utterances. (4 Annals of Congress, pp. 899–946) West Virginia State Board of Education v. Barnette, 1942, 319 U.S. 624, 641–642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628, had earlier than *Sullivan* indicated an approach similar to that of *Sullivan*, the Court there saying that, "We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority * * * freedom to differ is not limited to things that do not matter much. * * * The test of its substance is the right to differ as to things that touch the heart of the existing order." In the later case of Garrison v. Louisiana, 1964, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, extending the principle of *Sullivan* to the criminal libel context, the Court again observed that "speech concerning public affairs is more than self-expression; it is the essence of self-government" (379 U.S. at 74–75, 85 S.Ct. at 216). The First Amendment, thus, guarantees to the people as sovereign as the retained attribute of their ultimate sovereignty, their right, in open and wide-ranging debate, publication and assembly, to review the government they have created, the adequacy of its functioning and the presence or absence of a need to alter or displace it. See Meiklejohn, The First Amendment is an Absolute (The Supreme Court Review, 1961, Kurland ed.) 245, 255–263; Kalven, The New York Times Case: A Note on the Central Meaning of the First Amendment (The Supreme Court Review, 1964, Kurland ed.) 191, 207–210, 220–221; Brennan, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 1965, 79 Harv.L.Rev. 1, 10–14, 18–19.

The exercise of Congressional power that permissibly affects speech, press or assembly can not be a direct exercise of a power to control speech, press or peaceable assembly, but can only be an exercise of some other and undoubted power directed to an end other than restricting speech, press or peaceable assembly. In the case of such statutes as the Smith Act (18 U.S.C. § 2385), directed against subversive activity, a source of the power can readily be found in the express Congressional power to suppress insurrection (Article 1, Sec. 8, Cl. 15), and the Smith Act as an exercise of that power is justified, as *Dennis* shows, in terms of the immediacy of its relation to the preventing of subversive action (341 U.S. at 501, 509–510, 71 S.Ct. 857, 95 L.Ed. 1137) ; in *O'Brien* the power is the power to raise and support armies (391 U.S. at 377, 88 S.Ct. 1673, 20 L.Ed.2d 672) and the particular exercise of it is justified in terms of its relation to that end (391 U.S. at 380, 88 S.Ct. 1673) ; but in the case of *Robel*, although the Congress is exercising the war power, the attempted exercise is invalid under the First Amendment because the restriction on the rights of association is not proximately related as in *Dennis*—to preventing insurrection that would threaten the achievement of the war-power objective (389 U.S. at 264–266, 88 S.Ct. 419, 19 L.Ed.2d 508) ; and, similarly, in *Aptheker* the power is the power to provide for national security and the attempted exercise of it fails because, again, the magnitude of the effect of the inclusively phrased statute on First Amendment rights is not justified by the immediacy of the relation of the particular exercise of the security power to the achieving of the security objective (378 U.S. at 507, 508–509, 512–513, 84 S.Ct. 1659, 12 L.Ed.2d 992). *Robel* and *Aptheker* make clear that it is not enough that an undoubted Congressional power is being exercised ; the effect on First Amendment rights is justified only if the particular exercise of the power unavoidably entails that effect as an unsought incident to attaining the end for which the legislative power exists and is exercised. *Cf.* Brandenburg v. Ohio, *supra,* 395 U.S. at 447–448, 89 S.Ct. 1827, 23 L.Ed.2d 430.

The nature of the First Amendment rights as a retained attribute of the sovereignty of the people is reflected in the emphasis that recent adjudications particularly have given to the "right to hear." Lamont v. Postmaster General, 1965, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398, illustrates it in keeping unfettered the right of an addressee to receive communist political propaganda without having to request its delivery by the Post Office in writing. *Cf.* Martin v. City of Struthers, 1943, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313 (the right of freedom of speech and press embraces the right to distribute literature "and necessarily protects the right to receive it"). Stanley v. Georgia, 1969, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, is explicit that the Constitution protects the right to receive information and ideas, that the right to receive information and ideas, regardless of their social worth, "is fundamental to our free society." And Red Lion Broadcasting Co. v. F. C. C., 1969, 395 U.S. 367, 389–390, 89 S.Ct. 1794, 23 L.Ed.2d 371 notes the paramountcy in the radio broadcasting context of the public right to hear under the First Amendment ; the Court returned to the earlier statement in *Garrison* (379 U.S. at 74–75, 85 S.Ct. at 216) that speech concerning public affairs is more than self-expression, "it is the essence of self-government." See also Brooks v. Auburn University, 5th Cir. 1969, 412 F.2d 1171, 1172 ; Teague v. Regional Commissioner, *supra,* 404 F.2d at 445 (dollar exchange regulations "impinge on First Amendment freedoms," but not impermissibly) ; Molpus v. Fortune, N.D.Miss.1970, 311 F.Supp. 240, 249 ; United States v. Thirty-seven (37) Photographs, C.D.Cal.1970, 309 F.Supp. 36, 38 ; Smith v. University of Tennessee, E.D.Tenn.1969, 300 F.Supp. 777, 780 ; Snyder v. Board of Trustees, N.D. Ill.1968, 286 F.Supp. 927, 931–932.

■ The presence of the First Amendment in the Bill of Rights rather than in the main body of the Constitution does not imply that it is no more than a modal restriction on a general power elsewhere granted or assumed to exist by implication. The Pinckney Plan for a federal government would have included a provision respecting the freedom of the press (3 Farrand, The Records of the Federal Convention of 1787, (1937 rev. ed.) 595, 599, 609). His plan as presented included a clause that "The liberty of the Press shall be inviolably preserved" (2 Farrand 334, 341). During the debates Pinckney and Gerry together moved to include in the Constitution a clause in that language, 2 Farrand 617; Sherman is reported in Madison's notes then to have said simply, "It is unnecessary—The power of Congress does not extend to the Press," and the clause was voted down (2 Farrand 618, *cf. ib.* 611). Pinckney in addressing the South Carolina legislature ascribed the absence of a free press clause to the Convention's conclusion that, "The general government has no powers but what are expressly granted to it; therefore it has no power to take away the liberty of the press. That invaluable blessing * * * is secured by all our state constitutions; and to have mentioned it in our General Constitution would perhaps furnish an argument, hereafter, that the general government had a right to exercise powers not expressly delegated to it." (3 Farrand 256; 4 Elliot, Debates on the Adoption of the Federal Constitution, 315–316.) Wilson made a similar argument to the Pennsylvania convention respecting the omission of a Bill of Rights (3 Farrand 143–144; 161–162 "* * * not only unnecessary but improper. * * * Enumerate all the rights of men! * * * no gentleman in the late convention would have attempted such a thing;" see also 2 Elliot 435–436, 453–454). Hamilton in the Federalist (No. LXXXIV) emphasized in the same way that the Constitution was not a pact between a people and their sovereign (as were Magna Charta and the Petition of Right), but was founded on the power of the people, marked no surrender of right by the people and required no express reservation of their unsurrendered rights—"Why, for instance, should it be said that the liberty of the press shall not be restrained when no power is given by which restrictions may be imposed?" Jefferson, who, as President, treated the Sedition Act as a nullity for constitutional reasons and "discharged every person under punishment or prosecution under the Sedition law", considered that the Congress had been denied the right to control the freedom of the press, the states only having the exclusive power; he noted that in general state laws made the presses responsible for slander "as far as is consistent with their useful freedom. In those states where they do not admit even the truth of allegations to protect the printer, they have gone too far." 1 Adams-Jefferson Letters (Univ. of N.C. Press, 1959) 275, 281. *Cf.* Garrison v. State of Louisiana, *supra,* 379 U.S. at 67–73, 75, 85 S.Ct. 209; New York Times Co. v. Sullivan, *supra,* 376 U.S. at 278–279, 84 S.Ct. 710, 11 L.Ed.2d 686, requiring recognition of the defense of truth.

■■ Since the First Amendment is not in its primary and most significant aspect a grant by the Constitution to the citizens of individual rights of self-expression but on the contrary reflects the total retention by the people as sovereign to themselves of the right to free and open debate of political questions, the issue of "standing to sue" is immediately seen to be unreal. The concern of the First Amendment is not with a non-resident alien's individual and personal interest in entering and being heard, but with the rights of the citizens of the country to have the alien enter and to hear him explain and seek to defend his views; that, as *Garrison* and *Red Lion* observe, is of the essence of self-government. Mandel's status as a party does not rest on any individual right to enter (for he has none) but exists only as against the effort to

exclude him on a ground that denies to citizens of this country their primary rights to hear Mandel and debate with him. Here the plaintiffs other than Mandel are directly involved with Mandel's entry because they have invited him, and they expect to participate in meetings with him or expect to be among his auditors. No more is required to establish their standing. Cf. Snyder v. Board of Trustees, *supra*, 286 F.Supp. at 931–932; Smith v. University of Tennessee, E.D.Tenn. 1969, 300 F.Supp. 777, 780. The special relation of plaintiffs to Mandel's projected visit gives them a specificity of interest in his admission, reinforced by the general public interest in the prevention of any stifling of political utterance, that abundantly satisfies "standing" requirements.

Mandel is invited primarily to participate in university and college events. The essentiality of freedom of debate within the community of universities (Sweezy v. New Hampshire, 1957, 354 U.S. 234, 250, 262–263, 77 S.Ct. 1203, 1 L.Ed.2d 1311) has been repeatedly recognized and has drawn from the Court very strong expressions of the heightened importance of First Amendment rights in the field of education. Shelton v. Tucker, *supra*, 364 U.S. at 487, 81 S.Ct. at 251, stated that, "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Keyishian v. Board of Regents, 1967, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, characterized the national commitment to academic freedom as a "transcendent value to all of us" and a special concern of the First Amendment "which does not tolerate laws that cast a pall of orthodoxy over the classroom." See also Tinker v. Des Moines Community School District, 1969, 393 U.S. 503, 512, 89 S.Ct. 733, 21 L.Ed.2d 731; Pickering v. Board of Education, 1968, 391 U.S. 563, 568–569, 572, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811. In Wieman v. Updegraff, 1952, 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216, Mr. Justice Frankfurter, in a concurring opinion, warned that any inhibition upon the freedom of thought of teachers brought the First Amendment safeguards vividly into operation because unwarranted inhibition of the free spirit of teachers affects not only the teachers directly involved but unmistakably tends to chill that free play of spirit which all teachers ought to practice and to produce caution and timidity in the associations of potential teachers. That Mandel's visit is in general to be limited to the academic community gives particularized enhancement to the values for the self-governing process that are jeopardized by such exclusions as this case presents. A premise of the First Amendment is that free speech and press and peaceable assembly do not merely afford opportunity to teach and advocate political doctrines but by doing so assure that exposure of the vices and inadequacies of political doctrines that suppression, exclusion and silence cannot accomplish.

■ The prevention of the teaching and advocacy that is not incitement or conspiracy to initiate presently programmed violence is not in any degree a legitimate legislative objective but a forbidden one. It is forbidden, in ultimate analysis, because the public interest—expressed in the First Amendment—requires that the citizens as sovereign have access to, evaluate and accept or reject that teaching as well as every other teaching and advocacy.

■ It may remain true that in certain areas of administering the laws affecting immigration as they affect nonresident aliens not present in this country an all but absolute discretion to exclude can be vested in the executive or found to exist in the executive independently of Congressional action. See United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 542–544, 70 S.Ct. 309, 94 L.Ed. 317; United States ex rel. Turner v. Williams, *supra*, 194 U.S. at 289–291, 24 S.Ct. 719, 48 L.Ed. 979. Here the discretion is limited to the "waiver" aspect of the statute;

the executive is given the power to admit temporarily those whom the state declares ineligible. No standards are established to govern the exercise of that discretion, and no procedural provision is made to assure that it is exercised with due process of law. Such an executive discretion to invoke or suspend the operation of the general national power to exclude aliens may exist where the uses of the discretion do not impinge on interests protected by the First Amendment, but that it cannot exist here flows from the nature of the rights involved. In this case the admission of Mandel is but a lever by which the constitutional rights of his prospective citizen audience are to be given effect; they, as the articulately concerned portion of the sovereign people, assert a very high title to support Mandel's admission. *Cf.* Cobb v. Murrell, 5th Cir. 1967, 386 F.2d 947.

*Knauff*, resting in large part on the supposedly relevant contrast between "right" and "privilege" (338 U.S. at 544, 70 S.Ct. 309) can have no application where the effect of the executive action is not to deny a "privilege" to a "rightless" alien but to abridge constitutional rights of citizens and curb the exercise within this country of rights of free speech and peaceable assembly. (*Cf.* Van Alystine, The Demise of the Right-Privilege in Constitutional Law, 1968, 81 Harv.L.Rev. 1435.) The constitutional difference between the advocacy that cannot be suppressed and the incitement to violence that can be curbed is not lost by translating the matter into the immigration context and calling upon the "discretions" possibly exercisable in certain areas in that field. *Cf.* Harisiades v. Shaughnessy, supra, 343 U.S. at 591–592, 72 S.Ct. 512, 96 L.Ed. 586. The case is not different, when tested as an instance of the exercise of an unlimited executive discretion to exclude, from the cases in which the power to regulate the use of the streets is relied upon. Whether the effect of ordinances regulating use of the streets is an indiscriminate or undiscriminating

total exclusion, as in Schneider v. State (Town of Irvington), 1939, 308 U.S. 147, 160–162, 163, 60 S.Ct. 146, 84 L.Ed. 155, or the establishment of a power to exclude except under a standardless licensing procedure, as in Shuttlesworth v. City of Birmingham, *supra*, 394 U.S. at 150–152, 89 S.Ct. 935, 22 L.Ed.2d 162, the First Amendment precludes the stifling effect despite the undoubted power to legislate generally for order in the streets. But, ultimately, due process is not an issue since the Government is without any power to act in the area defined by (a) (28) and the presence or absence of procedural due process in the attempted administration of subsection (d) (3) becomes irrelevant.

The views expressed in the thoroughly researched dissent fail to recognize that the First Amendment peremptorily forbids equating the implied power to exclude aliens in the interest of national security and the even conduct of international affairs with a power to abridge the freedoms of speech, press and peaceable assembly. The challenged parts of the Act as here applied do only the latter forbidden thing and do not reflect a genuine exercise of the implied power of alien exclusion. The dissent's argument comes very close to saying that Mandel can be excluded on the ground that he harbors a proscribed sentiment and preaches proscribed theories so long as his doctrines and teaching can be introduced by mail, by live television and through the press; but, surely, it then becomes evident that the attempted justification for Mandel's personal exclusion on the ground of his preachments undercuts itself, for Mandel is under the Act excludable solely because of his identification with his doctrines, which admittedly cannot be excluded. Zemel v. Rusk, 1965, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179, as the dissent points out, does not really touch First Amendment issues; it represents a finding that the general prohibition on travel to Cuba was not aimed at abridging First Amendment freedoms but only incidentally inhibited the flow

to the United States of intelligence about Cuba; the Court recognized that inhibition "is a factor to be considered in determining whether [Zemel] has been denied due process of law * * *." *Zemel* does not validate a program of inhibition of interchange of information and ideas, but approves a general limitation on travel to Cuba in spite of the countervailing circumstance that it inhibited access to political information. It is not correct to say that *Zemel* "sanctioned a virtual ban on informational intercourse with the then sole existing Latin American experiment in Communism"; rather, the Court was reconciled with that undesirable consequence of the Secretary's action because it was otherwise and independently justifiable by the national interest. So much appears abundantly from the care with which the Court distinguished and preserved the authority of Kent v. Dulles, 1958, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204, on which *Zemel* so heavily relied; the Court in *Zemel* noted that in *Zemel's* case "the refusal to validate appellant's passport does not result from any expression or association on his part; appellant is not being forced to choose between membership in an organization and freedom to travel." That is, the *Zemel* result was sustained only because, unlike *Kent,* the travel ban was not linked to Zemel's opinions and affiliations.

It follows from what has been said that plaintiffs are entitled to an injunction against the defendants' implementing and enforcing Sections 212 (a) (28) and 212(d) (3) (A) (8 U.S.C. §§ 1182(a) (28) and (d) (3) (A)) so as to deny plaintiff Mandel admission to the United States as a non-immigrant visitor and to a declaratory judgment that Section 212(a) (28) is invalid and Section 212(d) (3) (A) is inoperative so far as they have been invoked to find plaintiff Mandel ineligible for admission under Section 212(a) (28) and to deny him temporary admission under Section 212(d) (3) (A).

Settle order on notice.

## APPENDIX

Immigration and Nationality Act of 1952, taken from 8 U.S.C. § 1101 et seq.

§ 1101.   Definitions.

(a) As used in this chapter—

\* \* \* \* \* \*

(37) The term "totalitarian party" means an organization which advocates the establishment in the United States of a totalitarian dictatorship or totalitarianism. The terms "totalitarian dictatorship" and totalitarianism" mean and refer to systems of government not representative in fact, characterized by (A) the existence of a single political party, organized on a dictatorial basis, with so close an identity between such party and its policies and the governmental policies of the country in which it exists, that the party and the government constitute an indistinguishable unit, and (B) the forcible suppression of opposition to such party.

\* \* \* \* \* \*

(40) The term "world communism" means a revolutionary movement, the purpose of which is to establish eventually a Communist totalitarian dictatorship in any or all the countries of the world through the medium of an internationally coordinated Communist political movement.

\* \* \* \* \* \*

§ 1182.   General classes of aliens ineligible to receive visas and excluded from admission; waivers of inadmissibility.

(a) Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

\* \* \* \* \* \*

(9) Aliens who have been convicted of a crime involving moral turpitude (other than a purely political offense), \* \* \*.

(10) Aliens who have been convicted of two or more offenses (other than purely political offenses), \* \* \*.

\* \* \* \* \* \*

(27) Aliens, who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States;

(28) Aliens who are, or at any time have been, members of any of the following classes:

(A) Aliens who are anarchists;

(B) Aliens who advocate or teach, or who are members of or affiliated with any organization that advocates or teaches, opposition to all organized government;

(C) Aliens who are members of or affiliated with (i) the Communist Party of the United States, (ii) any other totalitarian party of the United States, (iii) the Communist Political Association, (iv) the Communist or any other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state, (v) any section, subsidiary, branch, affiliate, or subdivision of any such association or party, or (vi) the direct predecessors or successors of any such association or party, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt: *Provided,* That nothing in this paragraph, or in any other provision of this chapter, shall be construed as declaring that the Communist Party does not advocate the overthrow of the Government of the United States by force, violence or other unconstitutional means;

(D) Aliens not within any of the other provisions of this paragraph who advocate the economic, international, and governmental doctrines of World communism or the establishment in the United States of a totalitarian dictatorship, or who are members of or affiliated with *any organization that advocates the* economic, international, and governmental doctrines of world communism or the establishment in the United States

of a totalitarian dictatorship, either through its own utterances or through any written or printed publications issued or published by or with the permission or consent of or under the authority of such organization or paid for by the funds of, or funds furnished by, such organization;

(E) Aliens not within any of the other provisions of this paragraph, who are members of or affiliated with any organization during the time it is registered or required to be registered under section 786 of Title 50, unless such aliens establish that they did not have knowledge or reason to believe at the time they became members of or affiliated with such an organization (and did not thereafter and prior to the date upon which such organization was so registered or so required to be registered have such knowledge or reason to believe) that such organization was a Communist organization;

[50 U.S.C. § 786 was repealed by Section 5q of Public Law 90–237]

(F) Aliens who advocate or teach or who are members of or affiliated with any organization that advocates or teaches (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any *other organized government,* because of his or their official character; or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage;

(G) Aliens who write or publish, or cause to be written or published, or who knowingly circulate, distribute, print, or display, or knowingly cause to be circulated, distributed, printed, published, or displayed, or who knowingly have in their possession for the purpose of circulation, publication, distribution, or display, any written or printed matter, advocating or teaching opposition to all

organized government, or advocating or teaching (i) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (ii) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers (either of specific individuals or of officers generally) of the Government of the United States or of any other organized government, because of his or their official character, or (iii) the unlawful damage, injury, or destruction of property; or (iv) sabotage; or (v) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship;

(H) Aliens who are members of or affiliated with any organization that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in subparagraph (G) of this paragraph; * * *.

(29) Aliens with respect to whom the consular officer or the Attorney General knows or has reasonable ground to believe probably would, after entry, (A) engage in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activity subversive to the national security, (B) engage in any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means, or (C) join, affiliate with, or participate in the activities of any organization which is registered or required to be registered under section 786 of Title 50; * * *.

* * * * * *

(d) (1) * * *

(2) * * *

(3) Except as provided in this subsection, an alien (A) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under one or more of the paragraphs enumerated in subsection (a) of this section (other than paragraphs (27) and (29)), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa, and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (B) who is inadmissible under one or more of the paragraphs enumerated in subsection (a) of this section (other than paragraphs (27) and 29)), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General.

* * * * * *

(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

(6) The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of excludable aliens applying for temporary admission under this subsection. The Attorney General shall make a detailed report to the Congress

in any case in which he exercises his authority under paragraph (3) of this subsection on behalf of any alien excludable under paragraphs (9), (10), and (28) of subsection (a) of this section.

\*　\*　\*　\*　\*　\*

§ 1225. Inspection by Immigration Officers.

\*　\*　\*　\*　\*　\*

(c) Temporary exclusion; permanent exclusion by Attorney General.

Any alien (including an alien crewman) who may appear to the examining immigration officer or to the special inquiry officer during the examination before either of such officers to be excludable under paragraphs (27), (28), or (29) of section 1182(a) of this title shall be temporarily excluded, and no further inquiry by a special inquiry officer shall be conducted until after the case is reported to the Attorney General together with any such written statement and accompanying information, if any, as the alien or his representative may desire to submit in connection therewith and such an inquiry or further inquiry is directed by the Attorney General. If the Attorney General is satisfied that the alien is excludable under any of such paragraphs on the basis of information of a confidential nature, the disclosure of which the Attorney General, in the exercise of his discretion, and after consultation with the appropriate security agencies of the Government, concludes would be prejudicial to the public interest, safety, or security, he may in his discretion order such alien to be excluded and deported without any inquiry or further inquiry by a special inquiry officer. Nothing in this subsection shall be regarded as requiring an inquiry before a special inquiry officer in the case of an alien crewman.

BARTELS, District Judge (dissenting):

In substance, the question posed by this application for injunctive and de-claratory relief is whether the inherent sovereign power to exclude aliens from entry into this country must bow to any interference with the right of Americans to hear under the First Amendment. The majority holds that subsections 212 (a) (28) and (d) (3) (A) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a) (28), (d) (3) (A) [popularly known as the McCarran Act], are unconstitutional because the "sole and selective effect of the statute is to operate as a means of restraining the entry of disfavored political doctrine \* \* \*" and further, that the sovereign power to exclude is irrelevant in this case to the constitutional inquiry because "there is not here any distinct aim of the exercise of that power that is primary and to the attainment of which the restraint of First Amendment interests is sacrificed in a secondary or mediating exercise of power." Stated in another way, the majority holds that the accused subsection (a) (28) is directed to no end other than the limitation of First Amendment rights. In reaching this conclusion the majority applied to subsection (a) (28) of the McCarran Act the test enunciated in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), proscribing strictures upon speech which merely advocates or teaches the "economic, international, and governmental doctrines of World communism" without incitement to the use of force to accomplish that end; in other words, the "clear and present danger" test.

Reaching this conclusion they hold, in effect, that there is no room for the application of the "balancing test" (*cf.* Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)) and that there exists a "reasonable alternative" (*cf.* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967)). With all due respect, I cannot accept the majority's conclusion predicated upon this analysis.

My difference with the majority stems from the fact that while recognizing the

sovereign power to exclude in the interest of self-preservation, they subordinate this interest to the First Amendment interest by applying standards invoked exclusively to strictures upon speech by American citizens and strictures upon the right of American citizens to hear other American citizens. In proceeding in this manner it seems to me that the majority has ignored the crucial fact that subsection (a) (28) serves the important objectives of (1) national security and (2) foreign policy, and that the exclusion of a disfavored political doctrine as expounded in person by an alien is not its aim but only a by-product.

Before discussing these two objectives, it is appropriate to note that the constitutionality of this statute could authoritatively rest upon the long-established principle that the Congressional power to exclude aliens is absolute.[1] From early times the Supreme Court has repeatedly held that no limits could be placed upon the power of Congress to exclude those classes of aliens who were deemed, for reasons sufficient to the Congress, as undesirable for entry into the United States. The Chinese Exclusion Case (Chae Chan Ping v. United States), 130 U.S. 581, 9 S.Ct. 623, 32 L. Ed. 1068 (1889); Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); Lem Moon Sing v. United States, 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895). In United States ex rel. Turner v. Williams, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904), this principle was clearly expounded by the court in validating the constitutionality of an enactment barring alien anarchists from entering the United States even though innocent of evil intent. There the court said:

"If the word 'anarchists' should be interpreted as including aliens whose anarchistic views are professed as those of political philosophers, innocent of evil intent, it would follow that Congress was of opinion that the tendency of the general exploitation of such views is so dangerous to the public weal that aliens who hold and advocate them would be undesirable additions to our population, whether permanently or temporarily, whether many or few; and, in the light of previous decisions, the act, even in this aspect, would not be unconstitutional, as applicable to any alien who is opposed to all organized government." (p. 294, 24 S.Ct. p. 724).

The majority claims that Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), indicates that *Dennis*, not *Turner*, is the governing standard in the area of alien exclusion. But *Harisiades* dealt only with the question of deportation of resident aliens. Neither that case nor any other authority supports the conclusion that the *Turner* principle no longer defines the exclusion power. The continuing validity of the early cases has been repeatedly recognized by later decisions reaffirming the principle that the determination of which classes of aliens may enter and remain in the United States is wholly within the sphere of the political branches of the government. See United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); Harisiades v. Shaughnessy, *supra*; Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956

---

[1]. This is a recognized principle of international law. In Nishimura Ekiu v. United States, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892), Mr. Justice Gray stated: "It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. Vat. Law Nat. Lib. 2, §§ 94, 100; 1 Phillim.Int.Law, (3d Ed.) c. 10, § 220." I Oppenheim, International Law (8th Ed. Lauterpacht) (1955) § 314; Westlake, International Law, part i, p. 210; IV Moore, Digest of International Law, § 550; Bouve, A Treatise on the Law Governing the Exclusion of Aliens in the United States 3 (1912).

(1953); Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954). Thus, in concurring in *Harisiades,* Mr. Justice Frankfurter observed that

"The conditions for entry of every alien, the particular classes of aliens that shall be denied entry altogether, *the basis for determining such classification,* the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control." (Emphasis supplied). (342 U.S. at 596–597, 72 S.Ct. at 522).

Several years later, writing for the majority in Galvan v. Press, *supra,* Mr. Justice Frankfurter added:

"As to the extent of the power of Congress under review, there is not merely 'a page of history,' * * * but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process. * * * But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government." (347 U.S. at 531, 74 S.Ct. at 743).

In Boutilier v. Immigration and Naturalization Service, 387 U.S. 118, 123, 87 S. Ct. 1563, 1567, 18 L.Ed.2d 661 (1967), Mr. Justice Clark remarked:

"It has long been held that the Congress has plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden."

See also Hitai v. Immigration and Naturalization Service, 343 F.2d 466 (2d Cir. 1965), cert. denied, 382 U.S. 816, 86 S.Ct. 36, 15 L.Ed.2d 63 (1965); Gor-

don and Rosenfield, Immigration Law and Procedure, § 2.2(a) (1968); Konvitz, Civil Rights and Immigration 3 (1953). The basis for this exceedingly broad application of the exclusion power is not difficult to ascertain. It is predicated upon the understanding that the power of Congress over admission of aliens touches "basic aspects of national sovereignty, more particularly our foreign relations and the national security." Galvan v. Press, *supra,* 347 U.S. at 530, 74 S.Ct. at 742.

### National Security

The Legislative and Executive responsibility for national security is the primary theme of the earliest cases rejecting attacks on applications of the exclusion power. See, e. g., The Chinese Exclusion Case (Chae Chan Ping v. United States), *supra,* and Fong Yue Ting v. United States, *supra.* In according priority to this interest the courts have done no more than follow the concept of the framers of the Constitution. Madison, often referred to as the father of our Constitution, wrote:

"Security against foreign danger is one of the primitive objects of civil society. * * *

" * * * The means of security can only be regulated by the means and the danger of attack. They will, in fact, be ever determined by these rules, and by no others. *It is in vain to oppose constitutional barriers to the impulse of self-preservation.* It is worse than in vain; because it plants in the Constitution itself necessary usurpations of power, every precedent of which is a germ of unnecessary and multiplied repetitions." (Emphasis supplied). The Federalist No. 41, pp. 204–205 (Everyman's Library 1961).

Hamilton repeated the axiom in these words:

"The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed.

This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defense." The Federalist No. 23, p. 111 (Everyman's Library 1961).

The early Supreme Court cases accordingly respected the Congressional determination that the entry into this country of certain classes of persons was a form of potential aggression and encroachment which need not be tolerated by a sovereign nation. A study of the Congressional findings which are the basis for the exclusionary provisions herein attacked demonstrates that a similar conclusion must be reached with respect to aliens falling within the proscribed classes.

Subsection (a) (28) of the Act tracked, in essence, Section 11 of Title I of the Internal Security Act of 1950, denominated the Subversive Activities Control Act of 1950. Section 2 of that Title set forth fifteen legislative findings derived from information concerning the world Communist movement presented to a number of legislative committees. Among others, Congress found that

"(1) There exists a world Communist movement which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization.

\*   \*   \*   \*   \*   \*

"(11) The agents of communism have devised clever and ruthless espionage and sabotage tactics which are carried out in many instances in form or manner successfully evasive of existing law. \* \* \*

"(12) The Communist network in the United States is inspired and controlled in large part by foreign agents who are sent into the United States ostensibly as attachés of foreign legations, affiliates of international organizations, members of trading commissions, and in similar capacities, but who use their diplomatic or semidiplomatic status as a shield behind which to engage in activities prejudicial to the public security."

Predicated upon these findings, Congress enacted the substantive provisions of the Act including the ineligibility rules here at issue. Viewed against this background these provisions do not appear to be solely a means of excluding a disfavored doctrine. Instead they manifest a considered legislative judgment that aliens who belong to Communist organizations and who espouse the doctrine of world Communism should not be permitted entry into the United States without prior Executive approval because of the objective threat which they pose to the national security since such individuals are more likely than others to engage in acts of sabotage, civil disruption, and illegal incitement to violence.

The majority's answer to this statement is that United States v. Robel, *supra*, renders such a judgment invalid because the statute fails to distinguish between protected and unprotected speech in determining the basis of exclusion. But *Robel* and its forerunner Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), are no authority for this conclusion. Neither involved the entry of an alien and in both cases the strict application of the "least drastic alternative" doctrine was predicated upon the finding that the provisions there at issue imposed a "substantial burden on protected First Amendment activities" (389 U.S. at 268, 88 S. Ct. at 426) because the means chosen to implement the governmental purpose "cut deeply into the right of association" (389 U.S. at 264, 88 S.Ct. at 424). In contrast, the impact on the First Amendment rights of American citizens resulting from the enforcement of subsection (a) (28) bears little, if any, resemblance

to the substantial interference with such rights in *Robel* and *Aptheker*. Subsection (a) (28) does not purport to ban the espousal of world Communism by any American. Nor does it seek to ban the importation of books, articles, or pamphlets written by Mandel or any other alien expressing the exact doctrines that Mandel desires to lecture upon or debate about in the United States. If it be suggested that there is a difference between the visual and audio medium, the Act does not prevent the recording and presentation of the very lectures the American plaintiffs desire to hear. And if the excitement of intellectual debate is what is at stake, the plaintiffs may, as they have suggested, secure Mandel's participation by means of a transcontinental hook-up. While this is not to suggest that the vicarious presence of Mandel is in all respects equivalent to his actual presence, it does serve to illustrate the limited interference with the American plaintiffs' First Amendment rights here at stake.

Cases much closer than *Robel* and *Aptheker* in approximating the nature and extent of interference with the instant plaintiffs' First Amendment rights are Teague v. Regional Commissioner of Customs, Region II, 404 F.2d 441 (2d Cir. 1968), cert. denied, 394 U.S. 977, 89 S.Ct. 1457, 22 L.Ed.2d 756 (1969), and Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). In *Teague* the court upheld a statute and regulations directing the Commissioner of Customs to detain packages originating in mainland China and North Vietnam until the addressee obtained a license authorizing their release. Since a license would not be granted unless payment for

the packages was made into a blocked account, the court, in effect, held that the interest of the national government in stemming the flow of currency to certain nations was superior to an American citizen's interest in receiving a book or a pamphlet prepared in North Vietnam which he could not receive gratuitously and one which the publisher understandably would not send if payment could only be made into a blocked account. Such a ruling substantially forecloses the channels of certain intercontinental communication to the bulk of the American people who, as individuals, might desire information from these Communist nations. The fact that certain publications and films are licensed for importation without restriction as to the method of payments under programs approved by the Librarian of Congress or the National Science Foundation or are licensed in exchange for publications from the United States provides no assurance that one or more publications will be exempt from the Act, or that such publications will be available at any institution, or that any individual will be willing, in order to exercise his rights, to identify himself. See Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). That the licensing regulations did not provide for the selective censorship of certain publications does not distinguish it from the instant case for it must be assumed that most of the publications emanating from Communist nations will be in the nature of doctrinal propaganda, just as the majority assumes that those who have espoused the doctrine of world Communism in the past are likely to continue such advocacy upon arrival in the United States.[2]

---

2. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), is not to the contrary because in that case there was no compelling governmental interest requiring the enactment of the statute there called into question.

The right to hear, like the right of association, is not mentioned in the Constitution. Whether it carries the same cre-

dentials as the right to speak depends upon future delineation. Upon this subject the words of Mr. Justice White as joined in by Mr. Justice Harlan in the dissent in *Robel* are significant. "The right of association is not mentioned in the Constitution. It is a judicial construct appended to the First Amendment rights to speak freely, to assemble, and to petition for redress of grievances.

Similarly, in the case of Zemel v. Rusk, *supra*, which involved a greater diminution in the free exchange of information and ideas than is here presented, the Supreme Court held that First Amendment rights were not even involved. In *Zemel* the court upheld the action of the State Department in banning travel to Cuba, which it had done pursuant to a statute providing that the Secretary of State may grant and issue passports under such rules as the President shall designate and prescribe for and in behalf of the United States.

To the appellant's argument that the "travel ban is a direct interference with the First Amendment rights of citizens to travel abroad so that they might acquaint themselves at firsthand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies", the court answered:

"We must agree that the Secretary's refusal to validate passports for Cuba renders less than wholly free the flow of information concerning that country. While we further agree that this is a factor to be considered in determining whether appellant has been denied due process of law, we cannot accept the contention of appellant that it is a First Amendment right which is involved. For to the extent that the Secretary's refusal to validate passports for Cuba acts as an inhibition (and it would be unrealistic to assume that it does not), it is an inhibition of action. There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. * * *. The right to speak and publish does not carry with it the unrestrained right to gather information." (381 U.S. at 16–17, 85 S.Ct. at 1280–1281).

If "travel" to Cuba to obtain information is "action", it would also appear that "travel" by Mandel to the United States to impart information is likewise "action". And, if the right to speak and publish does not carry with it the unrestrained right to gather information and ideas for American audiences, then the right to hear does not carry with it the unrestrained right to have foreign citizens orate those ideas in the United States.

With respect to the relative degrees of decreased data flow, one must admit that *Zemel* presents a more sympathetic First

---

[Footnote omitted.] While the right of association has deep roots in history and is supported by the inescapable necessity for group action in a republic as large and complex as ours, it has only recently blossomed as the controlling factor in constitutional litigation; its contours as yet lack delineation. Although official interference with First Amendment rights has drawn close scrutiny, it is now apparent that the right of association is not absolute and is subject to significant regulation by the State." 389 U.S. at 282–283, 88 S.Ct. at 434.
Without attempting to delineate the contours of the derivative contitutional right to receive information, it is to be noted that other recent cases applying this principle have not involved important countervailing governmental interests. Thus it is difficult to find any compelling state interest in vesting arbitrary authority in state college administrators to determine who may or may not accept invitations to speak to faculty and student groups. See Brooks v. Auburn University, 412 F.2d 1171 (5th Cir. 1969); Stacy v. Williams, 306 F.Supp. 963 (N.D.Miss.1969); Smith v. University of Tennessee, 300 F.Supp. 777 (E.D. Tenn.1969); Snyder v. Board of Trustees of the University of Illinois, 286 F. Supp. 927 (N.D.Ill.1968); Dickson v. Sitterson, 280 F.Supp. 486 (M.D.N.C. 1968). Similarly, a holding that a state cannot convict a person for possessing obscene material in the privacy of his own home does not interfere with any governmental interest of national moment and was clearly as much founded on the right to privacy as it was on the First Amendment. Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). As in Teague v. Regional Commissioner of Customs, Region II, *supra*, the governmental interest herein involved is enormously more important than the interests at stake in the other cases.

Amendment case than the instant one. Whereas in the case at bar we are dealing with a limited obstruction to the exchange of ideas, in *Zemel* the court sanctioned a virtual ban on informational intercourse with the then sole existing Latin American experiment in Communism. See dissent of Mr. Justice Goldberg, citing Chaffee, Three Human Rights in the Constitution of 1787, 195–196 (1956); The Supreme Court, 1964 Term, 79 Harv.L.Rev. 123, 127 (1965); Note, Resolving Conflict Between the Right to Travel and Implementing Foreign Policy, 1966 Duke L.J. 233.

The holding of *Zemel* barring American citizens from witnessing at firsthand the practical operation of Communism in Cuba would seem to dispose of the majority's argument that the First Amendment requires that the citizens as sovereign have access in person to every teaching and advocacy from all sources. It can hardly be said that the right to hear, as is the case with all First Amendment rights, is absolute and that it may not be limited or regulated by the government in certain circumstances. *Cf.* Dennis v. United States, *supra*; Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L. Ed. 513 (1949). *Zemel's* rejection of the "access" argument without nice calculations as to whether the interest supporting the prohibition could have been effected in any more limited manner suggests that not all inhibitions on the free exchange of information and ideas are to be held to the exact standard applied in *Robel* and *Aptheker*.

While the *Robel* court held that classification by membership in the Communist Party in America was too broad, it is clear that such classification *per se* is not invalid even though it imposes some burden upon freedom of speech. In Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), the Supreme Court affirmed an order of the Subversive Activities Control Board requiring the United States Communist Party to register as a "Communist-action organization" under Section 7 of the Subversive Activities Control Act of 1950. In so doing, the court expressly recognized that registration may entail some burdens on free expression due to the public obloquy associated with such membership. It nevertheless concluded that registration of all members of the Party without regard to the *quantum* of individual participation was constitutionally justified in view of the substantial danger presented by the Communist Party itself, as evidenced by the legislative findings of fact in Section 2 of the Act. In reaching this determination the court aptly remarked:

"But where the problems of accommodating the exigencies of self-preservation and the values of liberty are as complex and intricate as they are in the situation described in the findings of § 2 of the Subversive Activities Control Act—when existing government is menaced by a world-wide integrated movement which employs every combination of possible means, peaceful and violent, domestic and foreign, overt and clandestine, to destroy the government itself—the legislative judgment as to how that threat may best be met consistently with the safeguarding of personal freedom is not to be set aside merely because the judgment of judges would, in the first instance, have chosen other methods." (367 U.S. at 96–97, 81 S.Ct. at 1410–1411).

The majority contends that the national security concern manifested in the statute can adequately be protected by subsections (a) (27) and (a) (29) directly focusing on the potential illegal acts. Obviously, Congress in its legislative judgment, by enacting subsection (a) (28), believed these sections to be insufficient because of the unique and substantial threat to the security of the nation presented by members of the Communist movement who seek entry into this country. Even in domestic cases the danger presented by organizations engaged in illegal advocacy has been held sufficient to impose criminal sanctions

with respect to active and knowing members of the Communist Party without a requirement that such member be actually engaged in such illegal advocacy. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). From this it logically follows that aliens possessing a similar membership in a similar organization can be justifiably excluded under subsection (a) (28). And while it is necessary in wholly domestic cases, such as *Scales*, *Aptheker*, and *Robel*, to make precise judgments as to the extent of the individual's participation in the organization and his knowledge of the organization's illegal advocacy before imposing any significant burdens on him, the Government does not have the same opportunity to investigate the *quantum* and quality of an alien's participation in foreign organizations; nor does it have the same resources or power to screen the potentially subversive or other illegal activities of aliens seeking to enter this country; nor can the Government be expected to adequately delve into the precise goals or tactics of the many foreign Communist organizations. Persons within its borders are subject to its regulations and legal processes—aliens are not. The legislatively determined clandestine nature of the Communist Party, when operating in a foreign context, effectively precludes the precision of regulation of alien entries required by the majority. It is unreasonable and unrealistic to expect American consuls abroad to make such judgments as to alien members of the Communist movement on an *ad hoc* basis. Extension of the classification to also include aliens espousing world Communism is justified by similar considerations of secrecy and lack of information and investigative resources concerning the fact of formal affiliation with Communist organizations or concerning their propensity to achieve the aims of their espousal by impermissible means.

Another factor to be noted in considering world Communism is that the line dividing lawful speech from illegal incitement is evanescent and, as stated by Mr. Justice Jackson in Harisiades v. Shaughnessy, *supra*, "it often is difficult to determine whether ambiguous speech is advocacy of political methods or subtly shades into a methodical but prudent incitement to violence" (342 U.S. at 592, 72 S.Ct. at 520). A different treatment of aliens with Communist affiliations as opposed to Americans with such affiliations is also supported by the fact that the latter can be expected to possess a greater degree of loyalty and allegiance to the United States than the former. Thus, while the *Aptheker* and *Robel* courts would not permit the conclusion that an American citizen automatically becomes a potential public risk by virtue of his mere affiliation with the Communist Party, such a conclusion is valid when applied to an alien who does not possess the same tie to and the same interest in the nation as an American. In short, Congress, in enacting subsection (a) (28), had a right in the exercise of its legislative judgment to recognize the difference between a member of the Communist Party who is already an American and a member of the Communist movement who as an alien seeks entry. It had a right to decide that the risk of potential illegal exploitation and subversive activities is much greater in the latter than the former.

Consequently, I cannot agree that the absence of absolute precision in the statutory regulation of the potential dangers of illegal advocacy and subversion by a certain class of aliens is fatal to the instant enactment. Rather, in view of the substantial national interest at stake, the limited nature of the burden on free speech, and the unavailability of meaningful alternatives, I conclude that the exclusion provisions do not cut more deeply into the freedom of speech "than is necessary to deal with 'the substantive evils that Congress has a right to prevent' " (Scales v. United States, *supra*, 367 U.S. at 229, 81 S.Ct. at 1486) and, further, that these provisions are wholly outside the power of this court to control (Harisiades v. Shaughnessy, *supra*, 342 U.S. at 591, 72 S.Ct. 512). In the hierarchy of priorities the impera-

tive of national security in dealing with aliens must prevail over limited restrictions upon First Amendment rights.

### Foreign Affairs

Quite apart from protecting the paramount interest of national security, subsection (a) (28) can be amply justified as a tool for the flexible conduct of our foreign affairs. To prevent the priority of First Amendment rights in domestic or internal affairs from distorting our vision as to the vital importance of freedom in the conduct of our foreign affairs, it is necessary to emphasize the distinction. In United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315, 57 S.Ct. 216, 219, 81 L.Ed. 255 (1936), the Supreme Court reminds us of this difference in its statement that

> "It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted."

The exclusion power of a sovereign nation is one of the most important instruments in its arsenal for the independent conduct of its foreign affairs. Early appreciation of the close relationship between foreign affairs and immigration policy appears in Mr. Justice Gray's assertion that the power of exclusion was "vested in the national government, to which the constitution has committed the entire control of international relations, in peace as well as in war." Nishimura Ekiu v. United States, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). It is a truism that the Federal

Government, representing as it does all the States, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign governments and that the regulation of aliens is intimately blended and intertwined with the responsibilities of the Federal Government in this field. Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). See Harisiades v. Shaughnessy, *supra*, 342 U.S. at pp. 588–589, 72 S.Ct. 512; United States v. Curtiss-Wright Export Corp., *supra*, 299 U.S. at 318, 57 S.Ct. 216; United States v. Pizzarusso, 388 F. 2d 8, 9 (2d Cir. 1968), cert. denied, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968); Henkin, The Treaty Makers and the Law Makers: The Law of the Land and Foreign Relations, 107 Penn.L.Rev. 903, 917–922 (1959). History has shown that this country, like other nations, has over the year enacted numerous laws and entered into many treaties to attain its foreign policy objectives including the guarantee of rights to the aliens of those countries which grant similar rights to American nationals.[3]

The loss of thousands of lives and the expenditure of billions of dollars attest to the fact that the Federal Government has reached the judgment that the continued world-wide growth of the world Communist movement as practiced in its tyrannical form is inimical to the best interests of this nation. In a great measure the world-wide struggle against Communism involves a struggle for the allegiance of persons. That is one reason this country warmly welcomes and grants asylum to defectors from this totalitarian rule from many parts of the world. Another technique for resisting this worldwide movement is to bar admission to this country, even on a temporary basis, of aliens who aid and abet its growth

3. 28 U.S.C. § 2502 provides that the Court of Claims shall be open to the subjects or citizens of any foreign government which accords to the citizens of the United States the right to prosecute claims against their government in its courts. 22 U.S.C. § 256 grants jurisdiction to foreign consuls over their seamen only where such consuls' government grants the same rights to the United States consul by treaty. 8 U.S.C. § 1253(g) empowers the Secretary of State to instruct consular officers to discontinue the issuance of immigrant visas to nationals, citizens, subjects or residents of countries that refuse to accept deportees.

by membership in its organizations in other countries and by espousing its doctrine abroad. In *Zemel* the Supreme Court sustained passport restrictions on travel to Cuba predicated primarily upon the government's judgment that a major goal of the Castro regime is to export its Communist revolution to the rest of Latin America, and that travel between Cuba and the other countries of the Western Hemisphere is an important element in the spreading of subversion (381 U.S. at 14–15, 85 S.Ct. 1271, 14 L.Ed.2d 179). I see little difference in principle between this effort to physically isolate Communist Cuba and the effort to isolate the more general world-wide Communist movement by taking measures to dissuade potential adherents in various nations from supporting such movements.

Once it is understood that world Communism is not solely a doctrine but also a movement cutting across national lines, classifications, such as those set forth in subsection (a) (28), on the basis of adherence to that movement become understandable and justifiable. Obviously, it is in the national interest of the United States to provide its citizens with the greatest freedom of world-wide movement. However, whether a United States citizen may enter a particular country is determined by the government of the country to which entry is sought. Many of these countries are avowedly Communist or, at least, are strongly, if not decisively, influenced by the leaders of world Communism. To induce governments of such countries to adopt the reciprocal position of permitting the entry into, and freedom of speech of Americans in those countries for similar privileges extended to aliens, the government should have the power to exclude members of world Communism as a matter of foreign policy. This power must be entrusted to the Legislative and the Executive branches of the government and not to the courts. The following statement of Mr. Justice Jackson in Harisiades v. Shaughnessy, *supra,* is illustrative of the principle:

"However desirable world-wide amelioration of the lot of aliens, we think it is peculiarly a subject for international diplomacy. It should not be initiated by judicial decision which can only deprive our own Government of a power of defense and reprisal without obtaining for American citizens abroad any reciprocal privileges or immunities. Reform in this field must be entrusted to the branches of the Government in control of our international relations and treaty-making powers." (342 U.S. at 591, 72 S.Ct. at 520).

Reverting to the analogy of restrictions on the rights of American citizens to travel to certain Communist countries, the court in Worthy v. Herter, 106 U.S. App.D.C. 153, 270 F.2d 905, 910 (1959), cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959), expressly noted that such a restriction is "in and of itself a foreign policy," or "at least an instrument of foreign policy," citing individual examples of restrictions on travel to various countries until those countries released certain Americans who had been imprisoned there. Manifestly, the same holds true for the exclusion of Communist aliens from our country.

The relation between the exclusion power and the conduct of foreign affairs demonstrates why the rationale of *Robel* and *Aptheker* is inapposite to the instant case. For example, in *Robel* a more limited statute containing classifications regulating the employment of Communist Party members in defense plants might have been drafted without any objective loss to national security. But to impose a classification limitation upon the exclusion power of Congress or the discretion of the Executive to exclude or admit members of those classes would necessarily restrict, emasculate and dilute the power of the Federal Government to deal in foreign affairs with other governments or their citizens. To validate subsection (a) (28) it is not necessary to conclude that the power to exclude is absolute although the national interest in survival among nations suggests that it

must be. Since subsection (a) (28) is a limited exercise of that power amply justified by the interest of national security and the exercise by the Legislative and Executive branches of the Government of their foreign relations power, I conclude that its enactment is constitutional and that any effect upon First Amendment rights of American citizens to hear aliens (if they have such a right) is only incidental and necessary to accomplish the purpose sought to be achieved.[4]

### First Amendment Due Process

The majority assert that while the Executive discretion to admit temporarily those whom the statute declares ineligible may exist in those cases where the exercise of that discretion does not impinge on First Amendment rights, such discretion cannot exist where, as here, such rights are affected. It is argued that no provision is made in the statute to assure that the exercise of the Executive discretion is subject to the protection of due process. However, it is admitted that ultimately due process is not an issue since the Government is without any power to act under subsection (a) (28). Inasmuch as I reach the opposite conclusion that the Government has power to act in the area of subsection (a) (28), it is necessary to make a brief reference to the due process claim. The essence of plaintiffs' claim is that the procedure adopted by the Government violates First Amendment due process for only a judicial determination, for which there is no provision in the statute, suffices to impose a valid final restraint upon First Amendment rights, citing Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and Carroll v. President and Commissioners of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L. Ed.2d 325 (1968). These cases are inapposite to the necessity for review in the factual context here at issue. They focused upon the procedure which resulted in an initial decision suppressing expression in the United States by Americans without prior judicial participation or hearing. In essence, the court held in those cases that where judicial decision making is ultimately required, it must be imposed sooner rather than later in an adversary rather than in an *ex parte* proceeding. There is no basis to extend the application of these cases to require judicial review wherever an administrative decision may have the incidental effect of somewhat hindering an American's right to hear an excluded alien.

The attack here must in reality be focused upon the initial decision by the American Consul, without judicial participation, upon the question of eligibility; it can hardly be directed at the exercise by the Executive of the waiver power, although there are many references made by the plaintiffs to the arbitrary action of the Attorney General. Under the statute the waiver power can be exercised only after the American Consul reaches a final determination of ineligibility. This determination to waive or not to waive ineligibility is based on considerations extrinsic to the eligibility provisions of the statute which have been passed upon by the Consul and is peculiarly concerned with the political conduct of the government. Accordingly, there is little doubt that the option must be entrusted exclusively to the Executive branch of the Government without judicial interference. *Cf.* Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States ex rel. Knauff v. Shaughnessy, *supra.*

A similar conclusion must be reached with respect to the absence of judicial review of the American Consul's decision upon the question of eligibility but for a different reason. While an alien

---

4. Once it is determined that this statute does not on its face violate the First Amendment, it is irrelevant that some legislators might have voted for it with the motive of excluding unpopular political doctrine. United States v. O'Brien, 391 U.S. 367, 382–386, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

who has entered this country may be expelled only after procedural due process, an alien on the threshold of initial entry stands on an entirely different footing. As said in United States ex rel. Knauff v. Shaughnessy, *supra*, "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." (338 U.S. at 544, 70 S.Ct. at 313). Nishimura Ekiu v. United States, 142 U.S. 651, 12 S.Ct. 336, 35 L. Ed. 1146 (1892); Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1947). The requirement that aliens secure a visa from an American Consul abroad was first adopted as a security measure in 1917. Since that time statutory enactments, administrative interpretations and court decisions have uniformly held that the exercise of the Consul's determination was beyond judicial interference. "Whether the consul has acted reasonably or unreasonably is not for us to determine. Unjustifiable refusal to visé a passport may be ground for diplomatic complaint by the nation whose subject has been discriminated against. See 3 Moore's Digest, 996. It is beyond the jurisdiction of the court." United States ex rel. London v. Phelps, 22 F.2d 288, 290 (2d Cir. 1927), cert. denied, 276 U.S. 630, 48 S.Ct. 324, 72 L.Ed. 741 (1928). More recently, the Ninth Circuit Court of Appeals has reminded us that "Congress has conferred upon consular officers authority to issue or withhold a visa. Such determination is not subject to either administrative or judicial review." Loza-Bedoya v. Immigration and Naturalization Service, 410 F.2d 343, 347 (9th Cir. 1969); United States ex rel. Ulrich v. Kellogg, 58 App.

D.C. 360, 30 F.2d 984 (1929), cert. denied, United States ex rel. Ulrich v. Stimson, 279 U.S. 868, 49 S.Ct. 482, 73 L.Ed. 1005 (1929); Licea-Gomez v. Pilliod, 193 F.Supp. 577, 582 (N.D.Ill.1960); United States ex rel. Santarelli v. Hughes, 116 F.2d 613, 615 (3d Cir. 1940); Estrada v. Ahrens, 296 F.2d 690, 692, n. 2 (5th Cir. 1961); *cf.* Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895); Brownell v. Tom We Shung, 352 U.S. 180, 184, n. 3, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956). See generally Rosenfield, Consular Nonreviewability, 41 A.B.A.J. 1109 (1955). In the area of alien exclusion the case for non-judicial review is particularly strong. Flexibility must be granted to the Consul under all sections of the Act in order to adapt the Congressional policy to the variable conditions with which the Consul is from time to time confronted. Frequently his decision to deny a visa is predicated upon confidential information, the disclosure of the sources of which might endanger the public security and in some cases might seriously adversely affect our foreign relations. See Auerbach, The Visa Process and Review of Visa Application, 37 Int.Rel. 305, 309 (1960), and The Administration of the Immigration Laws by the Department of State and the Foreign Service, 36 Int.Rel. 6, 8 (1959).[5]

American citizens who desire to hear an excluded alien cannot, it seems to me for reasons of national security and in the interest of the proper conduct of our foreign affairs, demand a judicial review of the alien's exclusion. This is particularly true when it is realized that

---

5. As a practical problem it should be noted that the requirement of judicial review would present a task of enormous magnitude for the court since, in order to guard against arbitrary visa refusals, it would be necessary to provide a review for all visa refusals regardless of the asserted ground for such refusal. (See 1969 Report of Visa Office of the United States Department of State for precise figures.) To suggest that the problem of rectifying errors would be simple upon the thesis that a review would necessarily be limit-

ed to remedy obvious or egregious errors, is unrealistic. It cannot be assumed that arbitrary actions "leap from the record" (*cf.* Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1969)), especially where the factual background of the case is set in foreign lands having unfamiliar laws, customs and institutions. *Cf.* Scharpf, Judicial Review and the Political Question: A Functional Analysis, 75 Yale Law Journal 517, 567 (1966).

the alien himself has no such right. See United States ex rel. Turner v. Williams, *supra*, 194 U.S. at 292, 24 S.Ct. 719, 48 L.Ed. 979.

For the above reasons I conclude that the above subsections are valid and constitutional, and that the complaint herein should be dismissed.